S90A1172. THE STATE v. MILLER.
(398 SE2d 547)

CLARKE, Chief Justice.

Shade Miller, Jr. was arrested for violating OCGA § 16-11-38 when he appeared in public wearing the traditional regalia of the Ku Klux Klan ("Klan"), including a mask that covered his face. He admitted that he wore the mask, but challenged the constitutionality of the statute, alleging that it is unconstitutionally vague and overbroad,

---

[1] OCGA § 34-9-13 (d), supra.

and violates his freedom of speech and association under the United States and Georgia constitutions. The trial court held the statute to be unconstitutional and dismissed the case. We reverse.

In this appeal Miller argues (1) that the statute is unconstitutional as applied to him because wearing a mask is symbolic speech protected under the First Amendment to the United States Constitution and Art. I, Sec. I, Par. V of the Georgia Constitution of 1983; (2) that the statute is unconstitutionally vague and overbroad; and (3) that the statute violates his freedom of association under the First Amendment to the United States Constitution.

Known as the "Anti-Mask Act," OCGA § 16-11-38 provides as follows:

> (a) A person is guilty of a misdemeanor when he wears a mask, hood, or device by which any portion of the face is so hidden, concealed, or covered as to conceal the identity of the wearer and is upon any public way or public property or upon the private property of another without the written permission of the owner or occupier of the property to do so.
>
> (b) This Code section shall not apply to:
> (1) A person wearing a traditional holiday costume on the occasion of the holiday;
> (2) A person lawfully engaged in trade and employment or in a sporting activity where a mask is worn for the purpose of ensuring the physical safety of the wearer, or because of the nature of the occupation, trade or profession, or sporting activity;
> (3) A person using a mask in a theatrical production including use in Mardi Gras celebrations and masquerade balls; or
> (4) A person wearing a gas mask prescribed in emergency management drills and exercises or emergencies.

The "Anti-Mask Act" was enacted along with a "Statement of Public Policy," which reflects the General Assembly's awareness of and concern over the dangers to society posed by anonymous vigilante organizations. It reads as follows:

> All persons residing in the State are entitled to the equal protection of their lives and property.
> The law protects all, not only against actual physical violence, but also against threats and intimidations from any person or group of persons.
> The General Assembly cannot permit persons known or unknown, to issue either actual or implied threats, against

other persons in the State.

Persons in this State are and shall continue to be answerable only to the established law as enforced by legally appointed officers. Ga. L. 1951, p. 9, § 1, H.B. 12.

1. Miller argues first that the statute is unconstitutional as applied to him because his wearing a mask was protected symbolic speech under the Federal and Georgia constitutions.[1]

Freedom of speech is one of this nation's most treasured rights. "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust and wide-open.'" *Boos v. Barry*, 485 U. S. 312, 318 (108 SC 1157, 99 LE2d 333) (1988) (quoting *New York Times v. Sullivan*, 376 U. S. 254, 270 (84 SC 710, 11 LE2d 686) (1964)). "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U. S. _____ , _____ (109 SC 2533, 105 LE2d 342) (1989). The First Amendment is a broad umbrella that shelters all political points of view and shields a wide range of avenues for expression, including symbolic speech.[2] The 1983 Constitution of Georgia provides even broader protection.

However, conduct that may have some communicative element is not therefore immune from governmental regulation. Under the test enunciated in *United States v. O'Brien*, 391 U. S. 367, 376 (88 SC 1673, 20 LE2d 672) (1968), the government may regulate conduct that may have both speech and "nonspeech" elements if the regulation furthers a substantial governmental interest that is unrelated to the suppression of free expression; and the incidental restriction on First Amendment freedom is no greater than necessary to further the governmental interest. The Anti-Mask Act meets these criteria.

We know that "[p]ublic disguise is a particularly effective means of committing crimes of violence and intimidation. From the beginning of time the mask or hood has been the criminal's dress. It conceals evidence, hinders apprehension and calms the criminal's inward cowardly fear." M. Abram & A.. Miller, "How to Stop Violence! Intimidation! In Your Community" (August 15, 1949). A nameless, faceless

---

[1] Because Miller has not been convicted under the statute, his "as applied" arguments relate only to his arrest, which we find to be constitutional. The particular facts of this case may or may not support conviction under the statute as we construe it in Division 2, infra.

[2] We note that it appears from the record in this case that Miller's mask was worn solely to conceal his identity. For the purpose of this analysis we assume without deciding that Miller's wearing a mask was conduct " 'sufficiently imbued with elements of communication' to implicate the First Amendment." *Texas v. Johnson*, 109 SC, supra at 2540 (quoting *Spence v. Washington*, 418 U. S. 405, 409 (94 SC 2727, 41 LE2d 842) (1974)).

figure strikes terror in the human heart. But, remove the mask, and the nightmarish form is reduced to its true dimensions. The face betrays not only identity, but also human frailty.

OCGA § 16-11-38 was passed in 1951. Its passage was preceded by a period of increased harassment, intimidation and violence against racial and religious minorities carried out by mask-wearing Klansmen and other "hate" organizations. These groups operated as vigilantes and were responsible for numerous beatings and lynchings. Because of the masks, victims of Klan violence were unable to assist law enforcement officers in identifying their oppressors. They were afraid, perhaps, even to report such incidents in case law enforcement officers might have been involved.

The sponsor of the Anti-Mask Act, Judge Osgood Williams, testified that prior to the passage of the act, mask-wearing had helped to create a climate of fear that prevented Georgia citizens from exercising their civil rights. "Fear," he said, "is one of the things that makes people run the other way, [puts] people in a position [so] that they won't register to vote, they won't take part in political activities. . . ." He cited a headline from the Atlanta Constitution printed in March, 1949, that stated, "Klan Parades in Wrightsville Election Eve 400 Registered Negroes Fail To Vote."

The statute was passed in response to a demonstrated need to safeguard the people of Georgia from terrorization by masked vigilantes. Contrast *Texas v. Johnson*, supra (flag-burning had not caused actual breach of the peace so as to implicate the state's asserted interest in maintaining law and order). The governmental interests on which the Anti-Mask Act is predicated are positively set forth in the legislative "Statement of Public Policy" that precedes the Act. See id. at _____. The statute is intended to protect the citizens of Georgia from intimidation, violence, and actual and implied threats; it is also designed to assist law enforcement in apprehending criminals, and to restore confidence in law enforcement by removing any possible illusion of government complicity with masked vigilantes. The state's interests furthered by the Anti-Mask Act lie at the very heart of the realm of legitimate governmental activity. Safeguarding the right of the people to exercise their civil rights and to be free from violence and intimidation is not only a compelling interest, it is the General Assembly's affirmative constitutional duty. Georgia Constitution of 1983, Art. I, Sec. I. Par. VII.[3]

---

[3] We are unmoved by Miller's argument that the statute is unconstitutional because it was enacted in order to "unmask the Klan." Even if "unmasking the Klan" is synonymous with suppressing the Klan's freedom of speech — which it is not — we reject this argument because under settled principles of constitutional law the court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. *O'Brien*, supra

Further, these interests are in no way related to the suppression of constitutionally protected expression. The statute is content-neutral. It proscribes a certain form of menacing conduct without regard to the particular message of the mask-wearer. To the extent that the statute does proscribe the communicative aspect of mask-wearing conduct, its restriction is limited to threats and intimidation, which is not protected expression under the First Amendment. *Lanthrip v. State*, 235 Ga. 10 (218 SE2d 771) (1975); *Gooding v. Wilson* 405 U. S. 518 (92 SC 1103, 31 LE2d 408) (1972).

Miller next contends that the statute's incidental restriction on freedom of expression is greater than necessary to protect the governmental interests at stake. We disagree. As we interpret the statute, see Division 2 below, the statute's incidental restriction on expression is de minimis. The statute does not prevent Miller from appearing in public in his traditional Klan robe and pointed hat, which he points out in his brief symbolizes the "Klan's tradition of violence and terrorism." It does not prevent him from publicly proclaiming his message, from carrying any banner or flag, from wearing any badge or insignia, from handing out printed material, or from soliciting members. The law restricts only unprotected expression — the communication of a threat; and regulates only the noncommunicative function of the mask, the concealment of the wearer's identity. In other words, the statute "seeks to proscribe conduct, not free speech, and '. . . that conduct — even if expressive — falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. . . .' *Broadrick v. Oklahoma*, 413 U. S. 601, 615 (93 SC 2908) (1973)." *State v. Boone*, 243 Ga. 416, 419 (254 SE2d 367), cert. denied *Boone v. Georgia*, 444 U. S. 898 (100 SC 206, 62 LE2d 133) (1979).

2. Miller next argues that the statute is unconstitutionally vague and overbroad.

When addressing a facial overbreadth challenge, the court's first task is to ascertain whether the statute reaches a substantial amount of constitutionally protected conduct. *Boos v. Barry*, 485 U. S. at 324. However, "a . . . statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction . . ., see *Dombrowski v. Pfister*, 380 U. S. 479, 497 (1965), and its deterrent effect on legitimate expression is both real and substantial." *Erznoznik v.*

---

at 383. While the court will often consider legislative motives or purposes in interpreting a statute, "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it." Id. at 384. The purpose of this statute, as expressed in the "Statement of Public Policy" that was enacted along with the statute, is undeniably constitutional.

*City of Jacksonville,* 422 U. S. 205 (95 SC 2268, 45 LE2d 125) (1975).

Miller asserts that the statute criminalizes a substantial amount of innocent behavior, such as wearing a ski mask in mid-winter, wearing sunglasses on a sunny day, or wearing a mask to make a political point. As we interpret the statute, it does not sweep so broadly. When read with the "Statement of Public Policy," the meaning and purpose of the statute are clear. The language of the statute itself is therefore easily susceptible to a narrowing construction that avoids any constitutional overbreadth problem. Conviction under the statute requires the state to prove that the mask is worn with an intent to conceal the identity of the wearer. Further, we construe the statute in conjunction with its policy statement to apply only to mask-wearing conduct when the mask-wearer knows or reasonably should know that the conduct provokes a reasonable apprehension of intimidation, threats or violence. So narrowed, the statute does not reach a substantial amount of constitutionally protected conduct.

Miller next argues that such a narrowing construction of the statute renders it unconstitutionally vague because it requires law enforcement to cater to individuals' irrational and idiosyncratic fears. Plainly, it does not.

It is often necessary and appropriate to consider the context of certain behavior before applying a criminal statute. This does not make the statute unconstitutionally vague. See *Boos v. Barry,* supra. Due process requires only that a statute define the offense in terms that advise people of ordinary intelligence of the conduct sought to be prohibited, and that provide sufficient guidelines to prevent arbitrary enforcement. *Bell v. State,* 252 Ga. 267 (313 SE2d 678) (1984); *Kolender v. Lawson,* 461 U. S. 352 (103 SC 1855, 75 LE2d 903) (1983). Thus, we have upheld statutes that require an assessment of the surrounding circumstances before arresting a person for the offense of "loitering," see *Bell,* supra, and for disrupting activities in state buildings. See *Boone,* supra. Persons of common intelligence may readily appreciate mask-wearing conduct that provokes a reasonable apprehension of intimidation, threats or impending violence in a given context. For example, a person wearing a ski-mask in mid-winter would not ordinarily warrant alarm, but a person wearing a ski-mask on a warm day and while entering a bank certainly would.

3. Miller next argues that the statute violates his *freedom of association* under the First Amendment. He asserts that if he is not allowed to proclaim his message anonymously, fear of persecution will deter from asserting his beliefs at all.

This Court and the U. S. Supreme Court have long recognized that, under certain circumstances, anonymity may be essential to the exercise of constitutional rights. *Fortson v. Weeks,* 232 Ga. 472 (208 SE2d 68) (1974); *NAACP v. Alabama,* 357 U. S. 449 (78 SC 1163, 2

LE2d 1488) (1958). In *Talley v. California*, 362 U. S. 60 (80 SC 536, 4 LE2d 559) (1960), in which the Supreme Court held unconstitutional a statute that required all hand-bills to bear the true name and address of the person sponsoring them, the Supreme Court stated:

> Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. . . . Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes. Id. at 64.

It is equally plain, however, that anonymity has often been assumed for the most pernicious purposes. Anonymity is neither an absolute social good, nor an absolute constitutional right. Consequently, statutes that affect an individual's right to associate or to advocate anonymously are analyzed in light of the nature of the governmental interests furthered by the statute and the extent of the burden that they place on individual rights. *Buckley v. Valeo*, 424 U. S. 1, 68 (96 SC 612, 46 LE2d 659) (1976).

It is important to note that this statute, unlike the ordinance considered in *Talley*, supra, and situation presented in *NAACP v. California*, supra, does not require the Klan to reveal the names or addresses of any of its members. It does not prevent Klan members from joining the organization secretly or from wearing their masks when they meet on private property. It does not prevent the Klan from circulating anonymous literature, or from anonymously sponsoring signs, billboards or radio or television announcements. It only prevents masked appearance in public under circumstances that give rise to a reasonable apprehension of intimidation, threats or impending violence. We therefore conclude that the statute's effect on the Klan's ability to advocate or proselytize anonymously is negligible.

Further, we are unmoved by Miller's argument that he must appear masked in public to avoid persecution. This case is not like *NAACP v. Alabama*, supra. There, the organization "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other

manifestations of public hostility." 357 U. S. at 462. The state did not demonstrate any real need for the disclosure of the list. Id. Under those circumstances, the Supreme Court found that the organization's interest in maintaining the anonymity of its members outweighed the state's interest. In contrast, the record in this case is devoid of any proof of any injury to or loss of a job by members of the Klan.[4]

In sum, when individuals engage in intimidating or threatening mask-wearing behavior, their interest in maintaining their anonymity while in the public square must give way to the weighty interests of the State discussed above.

4. Finally, Miller argues that the statute violates the Equal Protection Clause of the Fourteenth Amendment. He says that the distinctions created by the statute — allowing mask wearing for holidays, balls and theatrical productions — discriminate unconstitutionally against mask-wearing for a political purpose.

In our view, the statute distinguishes appropriately between mask-wearing that is intimidating, threatening or violent and mask-wearing for benign purposes. It would be absurd to interpret the statute to prevent non-threatening political mask-wearing, or to condone threatening mask-wearing conduct on a holiday. We eschew such a construction of the statute. See *Boos v. Barry*, 108 SC at 1170. Contrast *Ghafari v. Municipal Court*, 150 Cal. 813 (87 Cal.App.3d 255) (1979).

In conclusion, we hold that the Anti-Mask Act proscribes mask-wearing conduct that is intended to conceal the wearer's identity and that the wearer knows, or reasonably should know, gives rise to a reasonable apprehension of intimidation, threats or impending violence. So construed, the Act passes constitutional muster.

*Judgment reversed. Clarke, C. J., Benham, Fletcher, JJ., and Judge William M. Fleming, Jr., concur; Smith, P. J., dissents; Bell and Hunt, JJ., concur specially; Weltner, J., not participating.*

HUNT, Justice, concurring specially.

I agree with the majority that the Anti-Mask Act may be construed to be constitutionally permissible. I disagree, however, that this court is authorized to construe the act to impose criminal liability where the mask-wearer merely knows or reasonably should know that his conduct (in wearing a mask intended to conceal his identity) will give rise to a reasonable apprehension of intimidation, threats, or impending violence. Criminal liability should be imposed only where he

---

[4] Miller's reliance on evidence that the GBI monitors or videotapes Klan meetings is unpersuasive. These practices do not constitute evidence of persecution of the Klan. Further, these practices are not mandated by the statute. Any deterrent effect they may have on the Klan's ability to associate anonymously is not at issue here.

intends to intimidate or to threaten or to create an environment for impending violence.

It is a long-standing rule that criminal statutes must be strictly construed against the state and liberally in favor of the accused. *Palmer v. State*, 260 Ga. 330, 331 (393 SE2d 251) (1990); *Knight v. State*, 243 Ga. 770, 775 (2) (257 SE2d 182) (1979); *Balkcom v. Defore*, 219 Ga. 641, 642 (2) (135 SE2d 425) (1964). A reading of the Anti-Mask Act, with its Statement of Public Policy, shows the act is intended to deter threats and intimidations by persons or groups of persons wearing masks. Yet the act itself contains no requirement of mens rea connecting the mask-wearer with the conduct to be deterred (threats or intimidations).[5] In reading an element of mens rea into the act,[6] I believe we are required, under the rule that criminal statutes be strictly construed in favor of human liberty, to choose that most beneficial to the defendant — actual intent. Thus, I would construe the Anti-Mask Act, with its Statement of Public Policy, to require an actual intent on the part of the mask-wearer to threaten or intimidate.[7]

I am authorized to state that Justice Bell joins in this special concurrence.

SMITH, Presiding Justice, dissenting.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content. [Cits.]" *Collin v. Smith*, 578 F2d 1197, 1202 (7th Cir. 1978) (cert. denied, 439 U. S. 916 (99 SC 291, 58 LE2d 264) (1978). (Nazi party allowed to demonstrate wearing Nazi uniforms and swastikas in Skokie, Illinois, a community where many Holocaust survivors lived.) First Amendment rights are precious and fundamental. Our constitutional system protects minorities, even those with the most unpopular views. Id. at 1201.

---

[5] I agree with the majority that if such an element of mens rea is not read into it, the act would improperly prohibit the expression of ideas (here, symbolic speech); would be overbroad and vague; would violate freedom of association; and would violate equal protection. In Division 2, the majority properly treats the vagueness and overbreadth claims separately, as they are distinct. The vagueness doctrine, which requires that a statute's meaning be determinable, is a feature of due process. Overbreadth, on the other hand, lies within the ambit of the First Amendment, so that a law is overbroad if it purports to prohibit not only acts which may be prosecuted, but also acts which are immune to regulation under the First Amendment. See Low, Jeffries & Bonnie, Criminal Law: Cases and Materials 2d, p. 73 (1986).

[6] The Model Penal Code contains four types of culpability, not including strict liability: purposely, knowingly, recklessly, and negligently. See generally LaFave & Scott, 1 Substantive Criminal Law, p. 300, § 3.4 (1986).

[7] While a conviction under this standard may be more difficult than one under the standard set by the majority (although either standard involves questions of fact for the fact-finder and would ordinarily be proved by circumstantial evidence), we do not have authority to read the act to encompass a wider range of conduct.

The purpose of the anti-mask statute is to *unmask* the Ku Klux Klan; not to prevent masked crimes. The trial court found, and it is undisputed, that the statute "was written with the specific intent of unmasking the 'Klan.' Therefore, the true legislative intent was to unmask a dissident group."[8] Judge Osgood Williams, one of the drafters of the statute and now a Superior Court judge, testified that in the 28 years he has been a Fulton County Superior Court judge not one person who committed an armed robbery while wearing a mask was charged under the anti-mask statute. The statute is not enforced against masked criminals generally; it is enforced against a dissident group. It was enacted and it is enforced as a means of preventing Klan members from appearing in public in masks. It is not the statute's ends, but its means, that is objectionable and unconstitutional.

Mr. Miller was charged with "Wearing a mask or hood which concealed his identity." He testified generally that his purpose in appearing on the courthouse square was to protest the anti-mask statute. He asserted that his identification as a Klan member could create danger for himself and his family. He was the only Klan member in Klan clothing on the square, he was not engaging in any threatening or menacing behavior, and his masked presence did not cause a breach of the peace. Under the majority opinion, his peaceful protest violates the statute because his "anonymity while in the public square must give way to the weighty interests of the State. . . ."

The majority asserts that the statute is merely one that regulates the time, place, or manner of speech and that it is content-neutral. I cannot agree. As recently stated by the United States Supreme Court in *Ward v. Rock Against Racism*, 491 U. S. \_\_\_\_\_ (109 SC 2746, 105 LE2d 661, 675) (1989):

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it

---

[8] According to Judge Williams, the legislative intent has been successful. The Anti-Mask Act brought about a reduction in Klan membership, curtailed activities, and brought about the demise of the Klan. He testified that the purpose of the bill was to stop Klan violence and to identify Klan members, and that "taking the mask off virtually drove them out of business in large measure . . . [, and] made it easier for the police to detect them." He also testified:

> [T]here are probably a goodly number of Klansmen who are nonviolent who wouldn't want to be identified because they do not want . . . their association to be identified. But that is not the only reason. Because of the open society that we have and the news media that we have, it's become tremendously unpopular to be a member of the Ku Klux Klan and those who may be — some individuals who are nonviolent who still don't want folks to know generally and their neighbors, friends and whatnot, that they are members of the Ku Klux Klan.

conveys. *Community for Creative Non-violence*, supra, at 295, 82 L Ed 2d 221, 104 S Ct 3065. The government's purpose is the controlling consideration. . . .

The legislative history, the trial court's order, and the majority's opinion all place emphasis on the fact that the statute was enacted because of *disagreement* with the Klan's message. Because the statute is content-based it "must be subject to the most exacting scrutiny." *Boos v. Barry*, 485 U. S. 312 (108 SC 1157, 99 LE2d 333) (1988); *Texas v. Johnson*, ___ U. S. ___ (109 SC 2533, 105 LE2d 342, 359) (1989) (flag burning case). As stated in *Johnson*, 105 LE2d at 355:

> "A law *directed* at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." [Cits.] It is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid. (Emphasis in original.)

The State must show that the statute furthers a compelling state interest. The majority finds a compelling interest in "[s]afeguarding the right of the people to exercise their civil rights and be free from violence and intimidation." However, there is no close nexus between the means chosen and the permissible objectives of the statute. Furthermore, the statute is not narrowly aimed at the permissible objectives. For example, the statute does not forbid Klan members from violating citizens' civil rights or from engaging in acts of violence and intimidation while wearing a Klan mask; it merely forbids wearing a Klan mask to conceal identity.[9] The General Assembly provided a comprehensive safeguard for the public when it enacted the "Antiterrorism Task Force," OCGA § 35-3-60 et seq., which specifically addresses the majority's concerns. Additionally, there are other specific criminal statutes aimed at safeguarding the public.[10]

If the communicative aspect of the mask-wearing conduct is the

---

[9] Concealing one's identity is not a crime in Georgia. A citizen may even give an arresting officer a false name and address if the arrest is unlawful. *Scott v. State*, 123 Ga. App. 675 (182 SE2d 183) (1971). It is only when a law enforcement officer is "in the lawful discharge of his official duties[,]" OCGA § 16-10-25, that it becomes unlawful to give a false name, address, or date of birth, with the intent of misleading the officer. Id.

[10] A few of the specific protective statutes follow: OCGA §§ 16-11-30, Riot; 16-11-31, Inciting to riot; 16-11-33, Unlawful assembly; 16-11-34, Preventing or disrupting lawful meetings, gatherings, or processions; 16-11-37, Terroristic threats and acts; 16-11-39, Use of "fighting words," obscene and vulgar or profane language; harassing phone calls; and 16-11-43, Obstructing highways, streets, sidewalks, or other public passages. See also "Georgia Antiterroristic Training Act" OCGA § 16-11-150.

expression of threats and intimidation, then Mr. Miller's peaceful protest of the anti-mask law violates the statute and no Klansman could appear in public wearing a mask to protest the anti-mask law. Under the majority opinion, the mere act of wearing a Klan mask triggers the statute because of the historic symbolic speech the majority attributes to the mask.[11] The majority opinion reads an irrebuttable presumption into the statute, i.e., because of the history of the Klan, the Klan mask is irrebuttably presumed to be symbolic speech that gives rise to apprehension of intimidation, threats or impending violence. A Klan member can violate the statute during a peaceful anti-mask demonstration in which there is no evil intent or conduct on the part of the wearer. Only Klan members wearing Klan masks bear this irrebuttable presumption; other individuals or groups can hold demonstrations while wearing masks and not violate the statute because the presumption is not present.[12]

I do not agree that the statute as written can be construed to be constitutional, but I do agree with part of Justice Hunt's concurring opinion. If a criminal intent is to be read into the statute, it must be an actual intent on the part of the actor that does not violate the actor's First Amendment rights. The majority's standard would proscribe mask-wearing conduct where the "wearer knows, or reasonably should know, [that his conduct] gives rise to a reasonable apprehension of intimidation, threats or impending violence." This standard, more appropriate to tort than criminal law, violates the First Amendment.

The United States Supreme Court in *Johnson*, 105 LE2d at 356, rejected the State's argument that if a certain audience takes serious offense at a particular expression (flag burning), the expression may be prohibited. The Court in *Johnson*, 105 LE2d at 356 said:

> Our precedents do not countenance such a presumption. On the contrary, they recognize that a principal "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as

---

[11] The Klan has not been forbidden from wearing their symbolic white robe and hat which can also be considered intimidating or threatening given the violent history of the Klan.

[12] Where non-Klan masks are concerned the law enforcement officers must look to the surrounding circumstances. For example if a police officer sees someone enter a bank with a ski mask on he can immediately check the nearest thermometer. If the temperature is 32 or below he need not arrest the individual, if the temperature soars to 50 there may be probable cause to arrest and another 20 degrees upward the officer may make a lawful arrest without any change in the conduct or the intention of the wearer. We may have the only criminal statute in the world that is temperature activated.

they are, or even stirs people to anger." [Cits.] It would be odd indeed to conclude *both* that "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection," [cits.], *and* that the Government may ban the expression of certain disagreeable ideas on the unsupported presumption that their very disagreeableness will provoke violence.

*Brandenburg v. Ohio*, 395 U. S. 444, 447 (89 SC 1827, 23 LE2d 430) (1969) sets the standard, and the *Johnson* court expressly rejected the opportunity to "eviscerate our holding in Brandenburg." *Johnson*, at 357. The only expressions that a state can ban without violating an individual's First Amendment rights are those expressions

> directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *Brandenburg v. Ohio*, 395 US 444, 447, 23 L Ed 2d 430, 89 S Ct 1827, 48 Ohio Ops 2d 320 (1969) (reviewing circumstances surrounding rally and speeches by Ku Klux Klan). Id.

The majority opinion's attempt to uphold the constitutionality of the statute falls short of this requirement. Advocacy of lawless action is protected, but incitement to *imminent* lawless action is not. "A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Brandenburg*, supra, 395 U. S. at 448. The United States Supreme Court has drawn the line between ideas and overt acts. The Klan's white robes, hats, and masks may all express the idea of a threat, but ideas are protected. Only an overt act accompanied by a specific intent violates the criminal law. OCGA § 16-11-37 (Terroristic threats and acts).

Certainly the State has a compelling interest in preventing intentional criminal behavior by masked individuals or groups as the mask makes identification difficult; however, the anti-mask statute as written and enforced is a content-based restriction on political speech directed to a dissident group in a public forum, and it is not narrowly tailored to serve a compelling state interest. *Boos*, supra, 485 U. S. at 321. I would find the statute unconstitutional for the reasons stated.[13]

---

[13] On October 12, 1990 I had the privilege of meeting with approximately 200 of south Georgia's finest high school seniors during the "Jefferson Community Meeting on the Bill of Rights." After a day-long discussion of Supreme Court cases including *Brandenburg* and *Collin*, supra, the students voted on the following question: "Should freedom of speech include the right of Nazi and other radical groups to advocate political ideas that are contrary to society's basic beliefs and offensive to large segments of the American people?" The over-

Decided December 5, 1990 —
Reconsideration denied December 19, 1990.

*Michael J. Bowers, Attorney General, Daryl A. Robinson, John C. Jones, Senior Assistant Attorneys General, Gerald N. Blaney, Solicitor, David M. Fuller, Assistant Solicitor,* for appellant.
*Michael R. Hauptman,* for appellee.
*Bondurant, Mixson & Elmore, Virginia L. Looney, Charles R. Sheppard, Ralph S. Goldberg, Chathleen Conneally,* amici curiae.

whelming majority of the students voted yes.