A93A1017. DANIELS v. THE STATE.
(438 SE2d 99)

BEASLEY, Presiding Judge.

At a bench trial, Daniels was found guilty of violating "The Anti-Mask Act," OCGA § 16-11-38 (a), which makes it a crime to wear a mask in public except in circumstances specified in OCGA § 16-11-38 (b) (1) through (4). He appeals from the judgment of conviction and sentence entered thereon. His motion for new trial was denied.

Two young girls, ages ten and twelve, were walking along a street in their neighborhood when they observed a man wearing a green wrestling mask and a plastic football helmet exit the home of Frank Bradford. The ten-year-old testified that she heard someone call the other child by name, and she turned around to see the masked person several feet behind them. The children began to run because they were "scared." Later they returned to the vicinity of the Bradford house where they observed police cars on the scene. An officer asked the child what the masked man had been saying to them, and she responded that he had been calling her friend's name "slow and saying, hey." The child observed appellant remove the mask and helmet and recognized him as someone she had seen in the neighborhood "every day," pushing a store buggy and collecting aluminum cans. She knew him as "Rambo" and has seen him since in the area "just pull[ing] his cart and picking up cans."

The arresting officer testified that he was patrolling the neighborhood when he observed the young girl walking along the street and a man walking about ten or fifteen steps behind her. He observed that the man appeared to be wearing "some type of football helmet on his head" and "also had on a green facial mask." The officer saw the youngster look back at the man several times and then look toward the police car. She appeared "to be uneasy" so he drove onto the sidewalk, separating the man from the child, whereupon the child began to run from the scene.

The officer questioned appellant about his purpose in wearing the mask and helmet. He replied that he had been at a friend's house and wore the mask as a prank to scare him. He denied having said anything to the child, stating that he was "just following her . . . hoping to scare her." His friend Bradford was questioned and confirmed that appellant had been visiting his home. He also told police that as appellant was leaving, he told him "not to wear the mask out on the street or the police might stop him." The girls then returned to the scene and were questioned by the officer concerning appellant's conduct. The ten-year-old apparently told the officer that appellant had been calling her friend's name. *Miranda* warnings were then administered and appellant was questioned further. According to the officer, he then "changed his story somewhat," admitting that he had been calling to the girl. After being taken into custody he stated that he had worn a mask on occasion while wrestling and had done so on this occasion to "intrigue" the girls.

Appellant testified that he found the mask and helmet in a trash can earlier that day and decided to wear them because the next day was a holiday (Memorial Day). On his way home, he came across some children playing in the street and he played with them for about ten minutes, while wearing the mask. He proceeded toward home and

stopped to visit with his friend Frank Bradford, who had recently been ill. As he was leaving, he put the mask on again despite his friend's admonition not to wear it because he might "get in trouble with it." He replied that it was a holiday and "everyone wears a mask on holidays. . . ." He proceeded toward home walking behind a young girl and a police car pulled up separating him from the child. When asked why he wore the mask after leaving the Bradford house, appellant testified: "[I]n case . . . I met some more kids . . . I'd entertain them some more . . . because it looked like them back there enjoyed it so much . . . and that just made my day just to see them laugh. . . ."

1. Appellant contends that the court improperly heard testimony from the arresting officer concerning statements made in response to police questioning prior to the receipt of *Miranda* warnings.

After what was essentially a *Jackson v. Denno* hearing, the court ruled appellant's pre-*Miranda* statements admissible. The officer testified that upon stopping appellant, he "began speaking with the individual, asking him . . . [the] purpose in the mask and helmet, what his intentions were, just basically what he was doing in this dress." He was not handcuffed, arrested, threatened, or coerced into responding.

"It is presumed that in his capacity as trier of fact the trial judge considered only legal evidence," *Simmons v. State*, 249 Ga. 860, 861 (2) (295 SE2d 84) (1982), "unless it appears from the judgment that [the court] considered testimony which should have been excluded." *Morris v. State*, 160 Ga. App. 50 (1) (285 SE2d 782) (1981).

"[T]he single threshold inquiry of the officer as to what was happening was not an impermissible 'interrogation' under Miranda." *Shy v. State*, 234 Ga. 816, 822 (I) (218 SE2d 599) (1975). The trial court correctly concluded that the officer was conducting a threshold inquiry to determine the nature of the situation and that appellant's responses were admissible despite the absence of *Miranda* warnings. *Shy*, supra at (I).

2. Appellant contends the court erred in denying his motion for a directed verdict of acquittal and in finding him guilty of the offense charged, in that the evidence was insufficient to support the verdict. "There is no verdict in a bench trial. [Cit.] The issue, then, is simply whether the evidence met the test of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979)." *Lee v. State*, 201 Ga. App. 827, 828 (1) (412 SE2d 563) (1991).

Appellant claims that the State failed to prove criminal intent necessary for conviction of the offense as construed in *State v. Miller*, 260 Ga. 669 (398 SE2d 547) (1990). In *Miller*, the constitutionality of OCGA § 16-11-38 (a) was upheld as non-violative of freedom of speech, freedom of association and equal protection of the law. The

Court construed the statute so as to "require[ ] the state to prove that the mask is worn with an intent to conceal the identity of the wearer. Further, we construe the statute in conjunction with its policy statement to apply only to mask-wearing conduct when the mask-wearer knows or reasonably should have known that the conduct provokes a reasonable apprehension of intimidation, threats or violence." Id. at 674.

The State's evidence in the present case was sufficient to establish that appellant wore the mask with the intent to conceal his identity and that he knew or should have known that his conduct would give rise to a reasonable apprehension of intimidation, if not threats or impending violence. There was evidence that defendant's own statement was that he intended to scare the children and in fact succeeded.[1] Both "intimidate" and "scare" mean "frighten." Webster's New Third Intl. Dictionary. His *motive* may have been to have fun, but that does not remove or exclude the offensive intent or manner of achieving the pleasure. A man following ten and twelve-year-old girls in a mask can reasonably be found to be intending intimidation, if not more.

Appellant's conviction under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), is affirmed.

*Judgment affirmed. McMurray, P. J., Cooper, Johnson and Blackburn, JJ., concur. Pope, C. J., Birdsong, P. J., Andrews and Smith, JJ., concur in part and dissent in part.*

SMITH, Judge, concurring in part and dissenting in part.

I concur as to Division 1 of the majority opinion, but respectfully dissent as to Division 2. I do so because the State failed to prove the elements of intent required by *State v. Miller*, 260 Ga. 669 (398 SE2d 547) (1990).

The purpose of the Anti-Mask Act, OCGA § 16-11-38, is discussed at length in *Miller*: "Its passage was preceded by a period of increased harassment, intimidation and violence against racial and religious minorities carried out by mask-wearing Klansmen and other 'hate' organizations." 260 Ga. at 672. The sponsor of the act testified that "prior to the passage of the act, mask-wearing had helped to create a climate of fear that prevented Georgia citizens from exercising their civil rights." Id. The Supreme Court concluded that "[t]he statute was passed in response to a demonstrated need to safeguard the people of Georgia from terrorization by masked vigilantes. . . . The statute is intended to protect the citizens of Georgia from intimida-

---

[1] That the child recognized defendant after he removed the mask is totally irrelevant to the issue of his intent. Moreover, even if she had recognized him beforehand, her seeing him in a masked condition would not necessarily remove the element of his intent.

tion, violence, and actual and implied threats; it is also designed to assist law enforcement in apprehending criminals, and to restore confidence in law enforcement by removing any possible illusion of government complicity with masked vigilantes." Id.

The majority recognizes that the Court in *Miller* construed the statute narrowly so as to "require[ ] the state to prove that the mask is worn with an intent to conceal the identity of the wearer. Further, we construe the statute *in conjunction with its policy statement* to apply only to mask-wearing conduct when the mask-wearer knows or reasonably should know that the conduct provokes a reasonable apprehension of intimidation, threats or violence." (Emphasis supplied.) 260 Ga. at 674. The evidence in this case fails to meet this standard under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

While the evidence is in conflict as to whether the ten-year-old child witness and her companion were "scared" or even startled by appellant's conduct in wearing the football helmet and mask,[2] there was insufficient evidence that appellant *intended* to conceal his identity or to engage in "intimidation, threats or violence." Appellant testified that he found a football helmet and green plastic mask in a trash can while collecting aluminum cans, and that he put them on because it was a holiday weekend. Under the exception created by OCGA § 16-11-38 (b) (1), the statute does not apply to "[a] person wearing a traditional holiday costume on the occasion of the holiday." That exception obviously does not apply here, since Memorial Day weekend is not a holiday during which masks or costumes are traditionally worn. However, this does not address the limitation created in *Miller* as to specific intent on the part of the wearer.

On the way home, appellant met some children aged nine or ten years, played with them for about ten minutes, and they appeared to enjoy it. These children followed him down the street calling him by name, so it does not appear that he had reason to believe that the mask concealed his identity. While appellant was cautioned by his shut-in friend that he "might get into trouble" by wearing the mask, he told him "you know, it was — holidays, you know, and everybody wears a mask on holidays, that's best known."

Appellant testified that he did not expect that anyone would be frightened or intimidated by his wearing the mask. The arresting officer testified, over objection, that appellant stated his intention to

---

[2] Amanda Cooper, in response to a leading question from the prosecution, testified that she felt "scared." However, she later testified that she recognized appellant as a local resident when he took off his mask, that she saw him every day traveling around with a buggy collecting cans, and agreed with the suggestion of defense counsel that she and her friend thought "this was kind of stupid."

"scare" his shut-in friend "as a prank," and that "he was just following [the child] hoping to — hoping to scare her." Nevertheless, it is nowhere shown that such an intent to "scare" or "intrigue" was anything other than a somewhat simple-minded attempt by appellant to amuse himself or others or that it rose to the level of intent required by *Miller*.

*Miller* acknowledges that the intent of the Anti-Mask Act, as expressed by its policy statement, is to thwart "masked vigilantes" who by intimidation, threats, or violence prevent Georgia citizens from exercising their civil rights. While appellant's conduct was, to say the least, both eccentric and ill-advised, the evidence did not establish beyond a reasonable doubt either that appellant intended to conceal his identity or that he knew or reasonably should have known that his conduct would provoke a reasonable apprehension of intimidation, threats or violence as contemplated in *Miller*.[3] The statute serves a necessary, but limited, purpose. Its application should be strictly limited in conformity with the holding in *Miller*. Since there was insufficient evidence to authorize a finding of guilt under the standard of proof prescribed in *Jackson v. Virginia*, 443 U. S. 307, supra, I would reverse.

I am authorized to state that Chief Judge Pope, Presiding Judge Birdsong, and Judge Andrews join in this opinion.

DECIDED OCTOBER 5, 1993 —
RECONSIDERATION DENIED NOVEMBER 19, 1993 —

*Rosemary E. Myers*, for appellant.
*Kenneth W. Mauldin, Solicitor*, for appellee.

---

[3] Prosecution might have been more appropriate here under the provisions of OCGA § 16-11-36 (b) (loitering and prowling), particularly since that statute requires a law enforcement officer, before making an arrest, to afford a suspect an opportunity to "identify himself and explain his presence and conduct."