S94G0362. DANIELS v. THE STATE.
(448 SE2d 185)

SEARS-COLLINS, Justice.

Roy Daniels was convicted of violating the "Anti-Mask Act," OCGA § 16-11-38[1] [or "the Act"], and his conviction and sentence were affirmed by the Court of Appeals, *Daniels v. State,* 211 Ga. App. 23 (438 SE2d 99) (1993). We granted certiorari to consider whether Daniels' actions constituted a violation of § 16-11-38. For the following reasons, we reverse.

1. The evidence introduced at the bench trial revealed these facts. Daniels, 49, is a former chicken catcher who supplements his Social Security disability income by collecting and recycling aluminum cans. On May 24, 1992, Daniels found a discarded football helmet and a green wrestling mask while looking through trash cans on the University of Georgia campus, near his home. When he returned

---

[1] Section 16-11-38 provides as follows:

(a) A person is guilty of a misdemeanor when he wears a mask, hood, or device by which any portion of the face is so hidden, concealed, or covered as to conceal the identity of the wearer and is upon any public way or public property or upon the private property of another without the written permission of the owner or occupier of the property to do so.

(b) This Code section shall not apply to:

(1) A person wearing a traditional holiday costume on the occasion of the holiday;

(2) A person lawfully engaged in trade and employment or in a sporting activity where a mask is worn for the purpose of ensuring the physical safety of the wearer, or because of the nature of the occupation, trade, or profession, or sporting activity;

(3) A person using a mask in a theatrical production including use in Mardi gras celebrations and masquerade balls; or

(4) A person wearing a gas mask prescribed in emergency management drills and exercises or emergencies.

to his neighborhood, Daniels donned the mask and the helmet to entertain some neighborhood children who were playing in the street. The children laughed, talked, and teased with Daniels, calling him by his neighborhood nickname, and generally appeared to enjoy the game.

Daniels then visited a friend who lived nearby. As he was leaving his friend's house, Daniels put the mask and helmet back on so that he could entertain any children he might meet. As Daniels walked down the sidewalk towards his home, there were two girls (then ages ten and eleven) walking in the same direction, ten to fifteen steps in front of him. Daniels called out to one of the girls by name. At that point an Athens police officer was driving his patrol car down the street in the same direction in which Daniels and the girls were walking. The officer testified that he saw Daniels' mask and saw one of the girls look back towards Daniels and towards the officer, and that the girl "appeared to be uneasy." The officer then drove his patrol car onto the sidewalk between Daniels and the girls in order to "investigate the dress that the individual had on at this time." When the officer pulled his car onto the sidewalk, the girls ran away. The officer questioned Daniels, who did not remove the mask until the officer finally told him to take it off because it was against the law. At least one of the girls returned later, saw Daniels remove the helmet and mask, and recognized Daniels as someone she saw daily around the neighborhood collecting aluminum cans in a grocery cart. Shortly thereafter, the police officer arrested Daniels for violating the Anti-Mask Act.

2. Daniels argues that the state failed to produce evidence sufficient to convince a reasonable trier of fact that Daniels possessed the requisite culpability or intent. We agree for two reasons:

(a) This court considered the Anti-Mask Act most recently in *State v. Miller*, 260 Ga. 669 (398 SE2d 547) (1990), where we noted that

> [the Act's] passage [in 1951] was preceded by a period of increased harassment, intimidation and violence against racial and religious minorities carried out by mask-wearing Klansmen and other "hate" organizations. These groups operated as vigilantes and were responsible for numerous beatings and lynchings. Because of the masks, victims of Klan violence were unable to assist law enforcement officers in identifying their oppressors. They were afraid, perhaps, even to report such incidents in case law enforcement officers might have been involved.

Id. at 672.

In *Miller*, we held that the Act does not unconstitutionally infringe upon any expressive conduct protected by the First Amendment which may be implicated[2] because the Act furthers the state's compelling interest, unrelated to the suppression of protected expression, in "[s]afeguarding the right of the people to exercise their civil rights and to be free from violence and intimidation." Id. at 672. However, in response to Miller's argument that the Act is unconstitutionally overbroad, the Court construed the Act to "require[ ] the state to prove that the mask is worn with [the] intent to conceal the identity of the wearer," id. at 674, and

> construe[d] the statute in conjunction with its policy statement to apply only to mask-wearing conduct when the mask-wearer knows or *reasonably should know* that the conduct provokes a reasonable apprehension of intimidation, threats or violence.

(Emphasis supplied.) Id. Thus, after *Miller*, an accused must be shown to have worn a mask outside the statutory exceptions (the actus reas), with the state of mind described by the court (the mens rea). Initially, we will consider what state of mind the evidence shows that Daniels actually possessed.

Four witnesses testified at Daniels' bench trial: Amanda Cooper, one of the "victims"; Timothy Parker, the police officer who first investigated the situation; Jeff Fitzgerald, a police officer called to the scene by Officer Parker; and Roy Daniels. Officer Parker testified that when he approached Daniels and began asking Daniels questions about his intentions and the purpose of the mask, Daniels "immediately began to tell [him] that everything was all right"; that when asked about his attire, Daniels said "he was doing this as a prank"; and that Daniels later repeated that he was only trying to "intrigue" the children. Officer Parker also stated that he decided to arrest Daniels because he "felt like [the Act] applied," and because Daniels initially told him that he had "made no statements" to the children but later said that he had called one of their names. Officer Fitzgerald testified that he accompanied Daniels back to Daniels' friend's home to verify that Daniels had just been there. Amanda Cooper testified that she and her friend, Shimea, heard Daniels call out "Hey, Shimea"; that they ran because Shimea "thought somebody tried to mess with her"; and that she felt "scared." Amanda also testified that

---

[2] Before analyzing the First Amendment implications of the Anti-Mask Act, the *Miller* majority "assume[d] without deciding that Miller's wearing a mask was conduct sufficiently imbued with elements of communication to implicate the First Amendment." *Miller*, 260 Ga. at 671, n. 2 (punctuation omitted).

she thought "this whole thing" was "stupid." Roy Daniels testified that his sole intent was to entertain the two children just as he had entertained the other boys and girls who seemed to get such pleasure out of his game, and that it occurred to him that the children might be entertained by the mask because he had at times entertained his own children when they were younger by wearing a mask of some sort. Also, there is no dispute that Daniels was in an area where he is well known, that he made no attempt to alter any other aspect of his appearance, and that the incident occurred during daylight hours.

We recognize that criminal intent is rarely the subject of direct evidence and may be inferred from circumstances. See *Wallace v. State*, 248 Ga. 255, 262-263 (9) (282 SE2d 325) (1981). However, we find nothing in the evidence described above from which it could reasonably be inferred that Daniels actually intended to do anything other than entertain the children. While the reaction of the mask-wearer's audience may be some evidence of the mask-wearer's state of mind, such evidence is not necessarily determinative. In this case, moreover, Amanda Cooper's statement that she was "scared," when considered in conjunction with the remainder of her testimony and the testimony of the other witnesses, does not support the conclusion that Daniels possessed the actual criminal intent to "threaten, intimidate, or cause the apprehension of violence." See *Miller*, 260 Ga. at 674. Daniels clearly intended only to playfully "scare" the children, as one would with a frightening Halloween mask or as would a character in a carnival funhouse. Daniels, while no Laurence Olivier, wore his mask for the sole purpose of entertainment, just as an actor or a clown might.

The next question is whether Daniels' state of mind satisfied the mens rea requirement established by *Miller*. We find that it did not. The Act itself manifests that mask-wearing, even scary-mask-wearing, for the purpose of amusement and entertainment, and for no other purpose, is beyond the purview of the evil the Act is intended to prohibit, that is, ridding the state of mask-wearing would-be desperados and the like. The Act expressly provides that it shall not apply to "[a] person wearing a traditional holiday costume on the occasion of the holiday," § 16-11-38 (b) (1), nor to "[a] person using a mask in a theatrical production including use in Mardi gras celebrations and masquerade balls," § 16-11-38 (b) (3). Moreover, the General Assembly's statement of policy, see *Miller*, 260 Ga. at 670-671, and the history of the Act, see id. at 672, make clear that the authors of the Act did not intend to criminalize mask-wearing for mere fun or entertainment.[3]

---

[3] We must endeavor to give life to both the "law" (the "technical embodiment of attempts to order society" expressed in words) and the "justice" ("the more abstract, ethical dimension of law which includes not merely consideration of rules but their purposes and

Therefore, we find that Daniels' actual intent, to entertain, is not encompassed by the Act.

(b) It appears that the trial court relied for its decision to convict Daniels on *Miller*'s holding that the Act applies when the mask-wearer "reasonably should know" that his conduct will threaten, intimidate, or provoke the apprehension of violence. See *Miller*, 260 Ga. at 674. Daniels argues, however, that the "reasonably should know" state of mind is traditionally a tort concept, and cannot support a criminal conviction unless it is equated with criminal negligence. See OCGA § 16-2-1. We agree; for a violation of a statute to constitute a crime in Georgia, either "intention or criminal negligence" must be present.[4] Id. Thus, to possess the "reasonably should know" state of mind set forth in *Miller*, a mask-wearer must be criminally negligent of the possibility that his conduct will threaten, intimidate, or provoke the apprehension of violence. As a basis for liability, criminal negligence is "[t]he reckless disregard of consequences, or a heedless indifference to the rights and safety of others, and a reasonable foresight that injury would probably result[.]" *Bowers v. State*, 177 Ga. App. 36, 38 (338 SE2d 457) (1985) (citation omitted). The *Miller* language encompasses the "reasonable foresight" aspect of criminal negligence; however, it fails to state the other criminal negligence requirement, "reckless disregard" or "heedless indifference." For clarity, therefore, we restate the standard: to obtain a conviction under the Anti-Mask Act, the state must show that the mask-wearer (1) intended to conceal his identity, and (2) either intended to threaten, intimidate, or provoke the apprehension of violence, or acted with reckless disregard for the consequences of his conduct or a heedless indifference to the rights and safety of others, with reasonable foresight that injury would probably result.

Applying the criminal negligence standard to Daniels, it is not entirely unreasonable to conclude that he should have had the "reasonable foresight" that "injury" (intimidation, apprehension of violence) might result from his conduct, even though his actual state of mind reveals a purpose excluded from the statute. However, given all

---

effective implementation") promoted by the Anti-Mask Act. "Thoughtless [literalism and] conformity" with the language of the Act leading to a result inconsistent with the Act's spirit would render the law "sterile and formalistic," distant from "the underlying social motives and beliefs from which it [was] born." See P. Williams, *The Alchemy of Race and Rights*, 138-139 (1991).

[4] While this is the general rule, some statutes which proscribe a particular act but make no reference to intent, such as some motor vehicle safety statutes, are construed to impose strict criminal liability. See *Queen v. State*, 189 Ga. App. 161, 162-163 (375 SE2d 287) (1988). Although no intent or fault requirement was included by the legislature in the Anti-Mask Act, the need for a narrowing construction recognized in *Miller* prohibited a strict liability interpretation. See *Miller*, 260 Ga. at 673-674 (2); see also 22 CJS 38, Criminal Law, § 32, n. 50.

the evidence pointing to Daniels' actual intent to entertain the children in this case, as opposed to threaten them, intimidate them, or create in them the apprehension of violence, we find the evidence insufficient to show that Daniels acted with the "reckless disregard of consequences," or the "heedless indifference to the rights and safety of" the children in this case necessary for conviction.[5] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment reversed. All the Justices concur, except Hunt, C. J., and Carley, J., who concur in the judgment only.*

DECIDED SEPTEMBER 21, 1994.

*Rosemary E. Myers*, for appellant.
*Kenneth W. Mauldin*, Solicitor, *Ethelyn N. Simpson*, Assistant Solicitor, for appellee.

---

[5] The appellant also argues that there was insufficient evidence that he intended to conceal his identity. In light of our holding in Division 2, however, it is unnecessary for us to resolve this issue.