S16A1369. WEST v. THE STATE.
(793 SE2d 57)

HUNSTEIN, Justice.

This interlocutory appeal presents a facial constitutional challenge to OCGA § 20-2-1182, which criminalizes upbraiding, insulting, or abusing a public school teacher, administrator, or bus driver in the presence of a pupil while on the premises of a public school or school bus. Appellant Michael Antonio West was arrested and charged under OCGA § 20-2-1182, and he thereafter filed a general demurrer, contending, among other things, that the statute is unconstitutionally overbroad in violation of the right to free speech guaranteed under the First Amendment to the United States Constitution.[1] The trial court denied West's demurrer but granted him a certificate of immediate review; West subsequently filed an application for interlocutory appeal, and we granted the application to review the substance of West's constitutional challenge. We agree with West that OCGA § 20-2-1182 is unconstitutionally overbroad and reverse the judgment of the trial court.

---

[1] West's general demurrer also cited to the free speech clause found in Georgia's Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. V.

Generally speaking, "[t]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (Citation and punctuation omitted.) *Ashcroft v. American Civil Liberties Union*, 535 U. S. 564, 573 (122 SCt 1700, 152 LE2d 771) (2002); accord *Final Exit Network, Inc. v. State of Ga.*, 290 Ga. 508 (1) (722 SE2d 722) (2012). Though there are a few narrowly defined forms of expression that are categorically excluded from free speech protections, see *United States v. Alvarez*, 567 U. S. 709 (132 SCt 2537, 2544, 183 LE2d 574) (2012) (enumerating categories of historically unprotected speech, such as defamation, obscenity, and fraud), content based restrictions on free speech that fall outside those narrow categories are subject to "exacting scrutiny." 132 SCt at 2548. Such restrictions are only valid if they are "narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U. S. 601, 611-612 (93 SCt 2908, 37 LE2d 830) (1973). Accord *State v. Fielden*, 280 Ga. 444, 445 (629 SE2d 252) (2006) (" '[B]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' " (Citations omitted.)).

To respect this

> "breathing space" and avoid deterring expression that may tend toward the outer boundaries of what is protected, the First Amendment overbreadth doctrine permits courts to invalidate laws burdening protected expression on their face, without regard to whether their application might be constitutional in a particular case.

*Scott v. State*, 299 Ga. 568, 569 (1) (788 SE2d 468) (2016). See also *United States v. Williams*, 553 U. S. 285, 292 (128 SCt 1830, 170 LE2d 650) (2008); *New York v. Ferber*, 458 U. S. 747, 768-769 (102 SCt 3348, 73 LE2d 1113) (1982). The overbreadth doctrine

> seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional — particularly a law directed at conduct so antisocial that it has been made criminal — has obvious harmful effects.

(Citations omitted.) *Williams*, 553 U. S. at 292; see also *Ferber*, 458 U. S. at 768-769. While a facial overbreadth challenge may be waged without respect to whether the restriction at issue might be constitutional in a specific instance, such a challenge will only prevail where the overbreadth is "substantial, not only in an absolute sense, but also relative to [its] plainly legitimate sweep." (Emphasis omitted.) *Williams*, 553 U. S. at 292. Accord *Ashcroft v. Free Speech Coalition*, 535 U. S. 234, 255 (122 SCt 1389, 152 LE2d 403) (2002) (overbreadth doctrine "prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process"); *Final Exit Network*, 290 Ga. at 511 (deterrent effect on protected expression must be "real and substantial" before statute is invalidated as overbroad); *State v. Miller*, 260 Ga. 669, 673 (2) (398 SE2d 547) (1990) (same).

The statute at issue here involves school premises, officials, and students.

> While it is true that rights protected by the First Amendment are not magically lost when one steps upon school property, "neither teachers, students, nor anyone else has an absolute constitutional right to use all parts of a school building for unlimited expressive purposes." *Connecticut State Federation of Teachers v. Board of Education Members*, 538 F.2d 471[,] 480 (2nd Cir. 1976). "Time, place and manner" regulations may be necessary to further significant governmental interests, and are permitted. But, in assessing the reasonableness of such regulations "we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." *Grayned* [*v. City of Rockford*, 408 U. S. 104, 116 (92 SCt 2294, 33 LE2d 222) (1972)]. The test, as announced in *Tinker v. Des Moines Independent Community School District*, 393 U. S. 503 (89 SCt 733, 21 LE2d 731) (1969) is whether a regulation is designed to restrict only that expression which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." [Id.] at 513.

*McCall v. State*, 354 S2d 869, 871 (Fla. 1978). It is "evident beyond the need for elaboration" that government has a compelling interest in protecting the physical and psychological well-being of children. *Osborne v. Ohio*, 495 U. S. 103, 109 (110 SCt 1691, 109 LE2d 98) (1990). "We nonetheless have the obligation to ensure that, in its zeal to promote this worthy aim, our legislature has not unwittingly

curtailed legitimate modes of expression in a real and substantial way." *Scott*, 299 Ga. at 575.

With these principles in mind, we begin our analysis, applying a de novo standard of review to the judgment of the trial court. *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (2) (691 SE2d 218) (2010).

The first step any court must take "in any overbreadth analysis is to construe the statute in question." *Scott*, 299 Ga. at 570. See also *Williams*, 553 U. S. at 293; *United States v. Stevens*, 559 U. S. 460, 474 (130 SCt 1577, 176 LE2d 435) (2010). Under our well-established rules of statutory construction, we

> presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its "plain and ordinary meaning," we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (751 SE2d 337) (2013). We "look to the text of the provision in question and its context within the larger legal framework[ ] to discern the intent of the legislature in enacting it." *Scott*, 299 Ga. at 571. See also OCGA § 1-3-1 (a), (b). However, where the statutory text is "clear and unambiguous," we attribute to the statute its plain meaning, and our search for statutory meaning ends. See *Deal*, 294 Ga. at 173.

OCGA § 20-2-1182, which is part of a collection of laws designed to address "loitering at or disrupting schools," provides as follows:

> Any parent, guardian, or person other than a student at the public school in question who has been advised that minor children are present and who continues to *upbraid, insult, or abuse* any public school teacher, public school administrator, or public school bus driver in the presence and hearing of a pupil while on the premises of any public school or public school bus may be ordered by any of the above-designated school personnel to leave the school premises or school bus, and upon failure to do so such person shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine not to exceed $500.00.

(Emphasis supplied.) Id. According to Webster's Third New International Dictionary (1966), to upbraid is to "criticize severely: find fault with" or to "reproach severely: scold vehemently," id. at 2517; an insult is "to treat with insolence, indignity, or contempt by word or action" or "a gross indignity offered to another either by word or act: an act or speech of insolence or contempt," id. at 1173; and, abuse is defined as "to attack or injure with words: reproach coarsely; disparage" or "language that condemns or vilifies, usually unjustly, intemperately, and angrily," id. at 8. Thus, the plain language of OCGA § 20-2-1182 makes it a misdemeanor for any person not a student — after being advised that pupils are present and continuing to speak critically, reproachfully, indignantly, or disparagingly toward any public school teacher, administrator, or bus driver in the presence and hearing of a pupil — to remain on the school premises or bus after being ordered to leave by a school official.

While we may be able to conceive of a statement that constitutes an "upbraid, insult, or abuse" that could be classified as "fighting words" and thus not subject to First Amendment protections, see *Chaplinsky v. New Hampshire*, 315 U. S. 568, 572 (62 SCt 766, 86 LE 1031) (1942) (words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace"), "we can just as easily formulate statements punishable by the statute which would not be likely to cause an average addressee to fight." *Ketchens v. Reiner*, 239 Cal. Rptr. 549 (III) (194 Cal. App. 3d 470, 475) (1987) (addressing similar statute). Accord *Shoemaker v. State*, 343 Ark. 727, 736 (2001) (concluding that "the undefined terms 'abuse' and 'insult' could include protected speech"). "[W]ords which merely offend, disgrace, anger or frustrate may not be prohibited in violation of one's right to freedom of speech." *Commonwealth v. Ashcroft*, 691 SW2d 229, 231 (Ky. 1985) (citing *Lewis v. City of New Orleans*, 415 U. S. 130 (94 SCt 970, 39 LE2d 214) (1974)).

Further, though ostensibly seeking to prevent disruptions to education or school activities, the statute neither ties the prohibited expression to the disruption of normal school activities nor limits the prohibitions to specific, fixed times, such as when school is in session. *McCall*, 354 S2d at 872. Also concerning, the statute does not proscribe all speech that might be boisterous or disruptive; instead, OCGA § 20-2-1182 prohibits only that speech directed at public school officials which may be perceived as negative or unfavorable. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828 (II) (115 SCt 2510, 132 LE2d 700) (1995). The practical effect of the plain language of OCGA § 20-2-1182 is that *any person* — may it be a parent, school

system employee, or concerned citizen while on school premises or a school bus — who dares to speak critically to school officials *at any time* in the presence of minors must leave the premises when so ordered by a school official or face arrest and prosecution for a misdemeanor.[2] Though the statute ostensibly only criminalizes the speech *after* the speaker refuses to leave school premises, the result is the same: the speaker is silenced, either through his or her absence on the school premises or school bus or through subsequent prosecution, based on the content of his or her speech, be it at a high school football game or a parent-teacher conference.[3] Cf. *Ward v. Rock Against Racism*, 491 U. S. 781 (109 SCt 2746, 105 LE2d 661) (1989) (recognizing that time, place, and manner restrictions must be content neutral).

Although this criminal statute may have a legitimate application, it also makes unlawful a substantial amount of constitutionally protected speech. See *City of Houston v. Hill*, 482 U. S. 451 (107 SCt 2502, 96 LE2d 398) (1987). While this Court "has the authority to narrow a statute to avoid unconstitutional infirmities . . . under our system of separation of powers[,] this Court does not have the authority to rewrite statutes." *Fielden*, 280 Ga. at 448. We agree with West that this statute, though perhaps well intentioned, neither regulates unprotected speech nor is appropriately tailored to meet its intended objective and is therefore overbroad. Accordingly, the judgment of the trial court denying the general demurrer is reversed.

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 31, 2016.

*Jason R. Clark; Bennett & Bennett, Mark W. Bennett*, for appellant.

*Maria S. Lugue, Solicitor-General*, for appellee.

*Sherry Boston, Solicitor-General, Wystan B. Getz, Assistant Solicitor-General*, amici curiae.

---

[2] The General Assembly has enacted other laws that proscribe disruptive conduct on school grounds that are content neutral. See, e.g., OCGA § 20-2-1181.

[3] In striking down a similar provision, a court of appeals in California recognized that the statute could be triggered by comments about a teacher's dress or perceived teaching abilities. *Ketchens*, 194 Cal. App. 3d at 475-476.