[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15118
_____

D.C. Docket No. 1:15-cv-03307-LMM


AUSTIN GATES,

Plaintiff-Appellee,

versus


HASSAN KHOKHAR, individually,
J. BRAUNINGER, individually,
JAMES WAYNE WHITMIRE, individually,
Officers of the City of Atlanta Police Department,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 13, 2018)

Before JULIE CARNES, EDMONDSON, Circuit Judges, and WILLIAMS,[*] District Judge.

JULIE CARNES, Circuit Judge:

This action arises from Plaintiff Austin Gates's arrest for violating Georgia's mask statute, O.C.G.A. § 16-11-38, during a protest in downtown Atlanta on November 26, 2014.  Plaintiff alleges that he was arrested without probable cause in violation of the Fourth Amendment, and that this flawed arrest also violated the First Amendment and various state laws.  In this appeal, we consider his claims against three City of Atlanta police officers who were involved in the arrest: defendants Khokhar, Brauninger, and Whitmire (collectively "Defendants").  As to these individual officers, and based on this arrest, Plaintiff has asserted federal claims, pursuant to 42 U.S.C. § 1983, as well as state law claims for assault and battery, invasion of privacy, unlawful detention, and malicious prosecution.  Defendants filed a motion to dismiss Plaintiff's § 1983 and state law claims on the grounds of qualified immunity and official immunity.  The district court, however, denied their motion, and they now appeal.

Having carefully reviewed the record, and after hearing oral argument, we conclude that Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims and to official immunity on Plaintiff's state law claims.  Accordingly, we

_____

[*] Honorable Kathleen Williams, United States District Judge for the Southern District of Florida, sitting by designation.

**REVERSE** the district court's order denying the motion to dismiss and **REMAND** the case for further proceedings consistent with this opinion.

## BACKGROUND

We assume the following facts to be true for purposes of this appeal.[1]  On November 26, 2014, Plaintiff participated in a march in downtown Atlanta to protest a grand jury's decision in a police-shooting case in Ferguson, Missouri. During the protest, Plaintiff was given a "V for Vendetta" mask by another protestor.  As the image attached to the complaint shows, the mask is a stylized image of the Guy Fawkes character from the movie "V for Vendetta."  It is designed to cover the entire face.  According to Plaintiff, the mask has become popular among people protesting against politicians, banks, and financial institutions.  Plaintiff acknowledges that he and other protesters wore the "V for Vendetta" masks during this Ferguson protest in Atlanta.  Plaintiff alleges that he wore the mask both to "express himself and his disagreement with the Ferguson, Missouri grand jury's decision," and to maintain his anonymity during the protest. Plaintiff claims he never intended to threaten or intimidate anyone by wearing the mask.

---

[1]  When considering the merits of a motion to dismiss under Federal Rule 12(b)(6), we accept the factual allegations in the complaint as true and construe them in the light most favorable to Plaintiff. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).  Thus, we take all of the relevant facts from the allegations in Plaintiff's complaint.

At some point during the protest, Defendant Whitmire ordered the protesters to remove their masks. Plaintiff acknowledges that Whitmire warned the protesters multiple times over a loudspeaker that any person wearing a mask during the protest would be arrested. Plaintiff, however, claims he did not hear the warning. Whitmire subsequently issued an order over the radio for the police to arrest anyone who was wearing a mask.

According to Plaintiff, after Whitmire issued the order to arrest protesters wearing masks, a "swarm" of officers dressed in riot gear, including Defendant Khokhar, pushed their way into the protesting crowd. Plaintiff alleges that Khokhar grabbed Plaintiff by the shoulder, pulled him by the strap of his backpack, and arrested him. When Plaintiff asked what he had done and why he was being arrested, Khokhar did not immediately respond. After conferring with other officers, Khokhar "handcuffed [Plaintiff] with plastic cuffs" and "shoved [him] into [a] police car." Khokhar told Plaintiff that he was being arrested for wearing a mask.

Plaintiff alleges that he subsequently was taken to the Zone 5 precinct, where he was searched and then left in a chair in a back room, handcuffed. While Plaintiff was detained, Khokhar drafted an offense report charging Plaintiff with violating Georgia's mask statute, O.C.G.A. § 16-11-38. The report stated:

> I [Officer Khokhar] observed [Plaintiff] wear a "V for Vendetta" mask. [Plaintiff] was actively participating in a protest. The protest

4

had been warned on the loud speakers multiple times that anyone wearing a mask will be arrested. This information was relayed by Unit 15 over the radio that anyone wearing a mask should be arrested. [Plaintiff] still had his mask on. [Plaintiff] was arrested for wearing a mask.

Defendant Brauninger, Khokhar's supervising officer, reviewed and authorized the offense report.

Based on the charges asserted against him in the offense report, Plaintiff, along with other arrestees from the protest, was booked, searched, and photographed at the precinct. After several hours of waiting at the precinct, Plaintiff was taken to the Fulton County jail. Once he arrived at the jail, Plaintiff was able to make a phone call and ultimately post bail.

Plaintiff filed a complaint about his arrest with the City of Atlanta Office of Professional Standards. The City determined that Plaintiff's arrest was "justified, lawful, and proper" and exonerated all of the officers who were involved in it. As noted, Plaintiff thereafter sued the City of Atlanta and the individual officers, asserting § 1983 claims and state law claims. The individual officers moved to dismiss Plaintiff's § 1983 claims on the ground of qualified immunity and his state law claims on the ground of official immunity.[2] The district court denied the motion.

---

[2] The City of Atlanta moved to dismiss Plaintiff's § 1983 claims under *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978), and to dismiss his state claims under the doctrine of sovereign immunity. The district court denied the City's *Monell* motion, but granted its

5

## DISCUSSION

### I.    Standard of Review

We review the denial of a Rule 12(b)(6) motion to dismiss on qualified or official immunity grounds *de novo*, applying the same standard as the district court. *See Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). When ruling on a motion to dismiss, we "accept[] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). To avoid dismissal, the "complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

### II.    Qualified Immunity

#### A.    Standard

Defendants argue that they are entitled to qualified immunity on Plaintiff's federal constitutional claims asserted under § 1983. "Qualified immunity protects government officials performing discretionary functions from suits in their

---

motion based on sovereign immunity. This appeal, however, does not involve those rulings, but instead concerns only the district court's denial of the individual officers' motion to dismiss.

individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (internal quotation marks omitted). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

To be clearly established, a right must be well-established enough "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted and alteration adopted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given the official fair warning that his conduct violated the law. *Id.* (emphasis added); *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [Defendant officers] with 'fair warning' that their conduct violated the Fourth Amendment.").

Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). However, a judicial precedent with identical facts is not essential for the law to be clearly established. *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

7

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue. *Griffin Indus.*, *Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007). And occasionally, albeit not very often, it may be obvious from "explicit statutory or constitutional statements" that conduct is unconstitutional. *Id.* at 1208–09. In all of these circumstances, qualified immunity will be denied only if the preexisting law by case law or otherwise "make[s] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans*, 626 F.3d at 563.

A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Assuming the defendant makes the required showing, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct. *See Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016). Plaintiff does not dispute that Defendants were acting in their discretionary authority when they arrested him on November 26, 2014. The burden thus lies with Plaintiff to show that his arrest violated a constitutional right and that the right

8

was clearly established at the time of the arrest.  *See id.*  Plaintiff cannot satisfy either prong of this analysis.

### B.    District Court's Order

The district court implicitly agreed that Defendants had probable cause to arrest Plaintiff based on the elements of the mask law as set out in the statute.  The court, however, noted that the Georgia Supreme Court has also imposed a mens rea element onto the statute, requiring that the wearer of the mask know or reasonably should know that his actions give rise to a reasonable apprehension of intimidation, threats, or impending violence.  The district court further added that Plaintiff had alleged that he never intended to threaten, intimidate, or cause the apprehension of violence by his mask-wearing.  Given this protestation by Plaintiff in his complaint, the district court concluded that the defendant officers lacked even arguable probable cause to arrest Plaintiff for violating the mask statute.

Addressing whether existing precedent gave Defendants fair notice that an arrest under these circumstances would be unlawful, the district court stated, "The Eleventh Circuit has concluded that it is '*clearly established* that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment.'  *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)." (emphasis in district court order) (alteration accepted).  The court concluded that

9

Defendants were therefore on notice that their arrest in this case was unlawful.  We disagree with the district court's analysis.

C.    Constitutional Violation:  False Arrest

In support of his § 1983 claims, Plaintiff alleges that he was arrested without probable cause while engaging in a protest, which action, he says, violated his Fourth Amendment and First Amendment rights.  It is true that a warrantless arrest lacking probable cause violates the Constitution, and such an arrest can therefore potentially underpin a § 1983 claim.  *Brown v. City of Huntsville*, *Ala.*, 608 F.3d 724, 734 (11th Cir. 2010).  The converse is also true, which means that "the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest."  *Id.*  *See also Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) (observing that "[w]hatever the officers' motivation . . . the existence of probable cause to arrest [the plaintiff] defeats [a] First Amendment claim" arising out of the arrest); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) (in the context of a First Amendment claim arising from an alleged false arrest, observing that "[w]hen a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested.").

"Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown*, 608 F.3d at 734.  It requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).  Thus, "innocent behavior frequently will provide the basis for a showing of probable cause." *Id.* Indeed, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted— indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

Even without actual probable cause, however, a police officer is entitled to qualified immunity if he had only "arguable" probable cause to arrest the plaintiff. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  Moreover, when an officer has arguable probable cause to arrest, he is entitled to qualified immunity both from Fourth Amendment claims for false arrest and from First Amendment claims stemming from the arrest.  *See Redd*, 140 F.3d at 1383–84 (because officers had arguable probable cause to arrest plaintiff (a minister preaching loudly on the sidewalk) for disorderly conduct, the officers were entitled to qualified immunity from both plaintiff's First and Fourth Amendment claims).

11

"Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Id.* (emphasis added and internal quotation marks omitted). *See also Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) ("[T]he inquiry is . . . whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." (internal quotation marks omitted)).

Whether an officer has probable cause or arguable probable cause, or neither, "depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735. The rationale behind qualified immunity is that an officer who acts reasonably should not be held personally liable merely because it appears, in hindsight, that he might have made a mistake. The concept of arguable probable cause therefore allows for the possibility that an officer might "reasonably but mistakenly conclude that probable cause is present." *Id.* Under this Court's governing precedent, such an officer likewise cannot be held personally liable for false arrest.

Viewing the facts in the light most favorable to Plaintiff, we think Defendants had actual probable cause to arrest Plaintiff for violating Georgia's mask statute. But even assuming they lacked actual probable cause, these officers clearly had arguable probable cause. We explain why.

12

The Georgia mask statute makes it a misdemeanor for a person to "wear[] a mask, hood, or device by which any portion of the face is so hidden, concealed, or covered as to conceal the identity of the wearer" while he is "upon any public way or public property." O.C.G.A. § 16-11-38(a). The statute includes exceptions for:

(1)    A person wearing a traditional holiday costume on the occasion of the holiday;

(2)    A person lawfully engaged in trade and employment or in a sporting activity where a mask is worn for the purpose of ensuring the physical safety of the wearer, or because of the nature of the occupation, trade, or profession, or sporting activity;

(3)    A person using a mask in a theatrical production including use in Mardi gras celebrations and masquerade balls; or

(4)    A person wearing a gas mask prescribed in emergency management drills and exercises or emergencies.

*Id.* § 16-11-38(b).

In addition to the statutory exceptions, the Georgia mask statute must be read in light of the limitations placed on it by the Georgia Supreme Court in *State v. Miller*, 260 Ga. 669 (1990) and *Daniels v. State*, 264 Ga. 460 (1994). In *Miller*, a Ku Klux Klan member—challenging the constitutionality of the mask statute— appeared in public wearing the traditional Klan regalia, including a mask that covered his face. *Miller*, 260 Ga. at 669. He was the only Klan member present in Klan clothing (and, thus, was part of no mass demonstration) and other than his mask-wearing, engaged in no threatening or intimidating conduct and caused no

13

breach of the peace. *Id*. at 678 (Smith, J. dissenting).  Miller claimed that by

prohibiting him from wearing a mask in public, the statute violated his right to

engage in symbolic speech. *See id*. at 669–72.  Explaining that the statute was

intended to protect "the people of Georgia from terrorization by masked vigilantes"

and "hate" organizations such as the Klan, *id.* at 672, the Georgia Supreme Court

determined that the State had a compelling interest in providing such protection,

and that the mask statute furthered that interest by prohibiting the "intimidation,

violence, and actual and implied threats" often associated with public mask-

wearing. *Id.*  Accordingly, the Court upheld the constitutionality of the statute

with the proviso that a person can be convicted of violating it only if the State also

proves that (1) the mask is worn with the intent to conceal the identity of the

wearer and (2) the wearer of the mask "knows or reasonably should know that [his]

conduct provokes a reasonable apprehension of intimidation, threats, or violence."

*Id.* at 674.

In *Daniels*, the Georgia Supreme Court applied the intent requirement

recognized in *Miller* to reverse a defendant's conviction under the mask statute.

*See Daniels*, 264 Ga. at 464.  The defendant in *Daniels* had been arrested and

convicted of violating the mask statute after police officers observed him, during

daylight hours, talking to several children in the street while wearing an old

football helmet and a wrestling mask. *See id.* at 461, 463.  Evidence presented at

14

the bench trial, however, indicated that the defendant was simply trying to entertain neighborhood children by wearing the helmet and mask, and that, under those circumstances, there was no intent to intimidate them or reckless disregard for the possibility that they might be intimidated. *See id.* at 461–63. The Georgia Supreme Court reversed the conviction, citing *Miller* and emphasizing that, in order to obtain a conviction under the mask statute, the State must show that the mask-wearer "(1) intended to conceal his identity, and (2) either intended to threaten, intimidate, or provoke the apprehension of violence, or acted with reckless disregard for the consequences of his conduct. . . with reasonable foresight that injury would occur;" *id.* at 464; that is, with reasonable foresight that his conduct would threaten, intimidate, or cause the apprehension of violence.

Taking into account the statutory elements of O.C.G.A. § 16-11-38, as interpreted by the Georgia Supreme Court in *Miller* and *Daniels*, we conclude that Defendants had probable cause to arrest Plaintiff for violating the mask statute under the circumstances alleged in the complaint. Construed in Plaintiff's favor, the facts within the collective knowledge of Defendant officers were as follows. Defendant officers were on the public streets of Atlanta as a "crowd" of demonstrators marched peacefully in protest of the grand jury decision in the Ferguson, Missouri police shooting case. Some of the protestors— including Plaintiff—were wearing "V for Vendetta" masks. The masks covered the entire

15

face and, thus, concealed the identity of the wearer. At about 9:15 p.m., the police began ordering the protestors to disperse. Officers also issued "repeated orders" over loud speakers for protestors to remove their masks or be subject to arrest. At about 10:00 p.m., a "swarm of officers in full riot gear pushed their way into the crowd" of protestors. Officer Khokar then arrested Plaintiff, who was still wearing his mask as he continued to march on public property.

Plaintiff alleges no facts that would support the application of any of the statutory exceptions to the prohibition on mask-wearing. That is, Plaintiff was not wearing the mask as part of a traditional holiday costume or theatrical production, for the purpose of ensuring his safety while engaged in a particular trade, profession, or sporting activity, or during an emergency or emergency drill. *See* O.C.G.A. § 16-11-38(b). Given these facts, an objectively reasonable officer at the scene could have believed that probable cause existed to arrest Plaintiff for violating the mask statute. *See Lee*, 284 F.3d at 1195.

Plaintiff argues, however, that when one also factors in the additional intent requirement imposed onto the statute by *Miller* and *Daniels* for purposes of sustaining a conviction, Defendants had neither arguable nor actual probable cause to believe that Plaintiff wore the "V for Vendetta" mask with the intent to threaten, intimidate, or provoke the apprehension of violence, or with reckless disregard for the fact that his conduct could cause the above reaction. We disagree.

16

First, as far as arguable probable cause is concerned, our Court has repeatedly held that "[s]howing arguable probable cause does not . . . require proving every element of a crime." *Brown*, 608 F.3d at 735. *See also Dahl*, 312 F.3d at 1234 ("That the officers had no specific evidence as to [one] element, [as necessary to sustain a conviction] at trial, did not prevent them from having probable cause to make the arrest."); *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001) ("Arguable probable cause does not require an arresting officer to prove every element of a crime[.]"). To require an arresting officer to prove every element of a crime "would negate the concept of probable cause and transform arresting officers into prosecutors." *Lee*, 284 F.3d at 1195. In particular, we have never pronounced a rigid requirement that an arresting officer must have specific evidence of the subjective intent and knowledge of a subject beyond the subject's conduct that otherwise gives rise to probable cause to arrest. In fact, we have acknowledged that "no police officer can truly know another person's subjective intent." *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007).[3]

---

[3] Of interest, albeit not dispositive for purposes of a § 1983 analysis, the Georgia Supreme Court has suggested that an arrest for violation of the mask statute can be lawful, even though the facts concerning the intent element would be insufficient to justify a conviction. In *Miller*, the Georgia Supreme Court distinguished between the evidence sufficient to support an arrest under the mask statute and the evidence required to sustain a conviction, noting that the defendant's arrest was constitutional but that "[t]he particular facts of [the] case may or may not support conviction under the statute." *See Miller*, 260 Ga. at 671 n.1.

17

The Georgia Supreme Court has instructed that, in assessing whether a mask-wearer acts with the requisite criminal intent, one must consider the surrounding circumstances. *See Miller*, 260 Ga. at 674; *Daniels*, 264 Ga. at 463–64. Given the circumstances of this case, an objectively reasonable officer in Defendants' position could have believed that Plaintiff was either actually trying to intimidate or reasonably would have known that his conduct would provoke a reasonable apprehension that he was doing so, which is, in relevant part, the intent element imported into the statute by the Georgia Supreme Court in *Miller* and *Daniels* for purposes of sustaining a conviction.

Like some other protesters, Plaintiff was wearing a mask that covered his entire face, and thus concealed his identity, during this night-time protest. That conduct might be sufficient by itself to suggest an intent to intimidate. But there is more: the calculus changed dramatically when the police repeatedly asked the masked protesters to remove their masks, else be arrested. Notwithstanding this command, Plaintiff nonetheless persisted, in what could reasonably be perceived as defiance of this lawful order by the police. A reasonable officer could infer that Plaintiff intended to intimidate based on such conduct, or, at the least, infer that Plaintiff could reasonably foresee that his behavior would be viewed as intimidating. *Cf. Miller*, 260 Ga. at 671–72 (recognizing that a "nameless, faceless figure strikes terror in the human heart").

18

That Plaintiff now alleges he did not hear Whitmire's warnings to remove his mask is immaterial.  For purposes of our qualified immunity analysis, "we look only to whether a reasonable officer, <u>knowing what [Defendants] knew at the time</u>, objectively could have believed probable cause existed."  *See Brown*, 608 F.3d at 736 (emphasis added).  Here, over a loud speaker, the police issued multiple warnings directing protestors to remove their masks.  Given all the surrounding circumstances, an objective officer could reasonably have interpreted Plaintiff's refusal to comply with multiple orders to remove his mask as a gesture intended to intimidate.  *See id.* (where a disorderly conduct statute required an intent to create public annoyance, but where the arresting officer could not know for sure what the plaintiff's intent was,  the plaintiff's "actions in playing loud music, stopping her car, and rolling her window down could have indicated to an objectively reasonable officer at the scene that [the plaintiff] was making unreasonable noise with intent to create public annoyance" in violation of the statute); *Lee*, 284 F.3d at 1195 (concluding that there was arguable probable cause for the plaintiff's arrest because "[a] prudent law enforcement officer . . . could have believed that [the plaintiff] was honking her horn for a purpose other than signaling danger," in violation of a county noise ordinance).

In concluding that arguable probable cause to arrest was lacking, the district court relied on Plaintiff's allegation that he never intended to intimidate anyone

19

through his wearing of the V for Vendetta mask.  Ergo, the court concluded, arguable probable cause evaporated.  This approach was error.  It is not Plaintiff's post-hoc explanation of his actions that counts.  What matters is what a reasonable police officer under the circumstances could infer from those actions.  A reasonable officer could infer that, in disobeying Whitmire's commands to remove his mask, Plaintiff actually intended to intimidate or, at the least, acted with "reasonable foresight" that his conduct would do so.

Although not outcome-determinative, we also note that, in explaining the origins of the Guy Fawkes mask, Plaintiff implicitly acknowledges that the mask could be perceived as celebrating violent protest against the government.  Specifically, the complaint links to an article[4] that describes Guy Fawkes as "an infamous insurgent who tried to blow up the British Parliament in 1605."  *See* http://theweek.com/articles/463151/brief-history-guy-fawkes-mask.  The article notes that the Guy Fawkes mask became more familiar in popular culture following release of the graphic novel and film *V for Vendetta*, whose protagonist is a vigilante who attempts to destroy the government.  *Id.*  The association of the "V for Vendetta" mask with vigilantism and the violent overthrow of the

---

[4]  The article states, in part:  "Over the past decade, dissidents across the globe have appropriated the visage of Guy Fawkes, the infamous insurgent who tried to blow up the British Parliament in 1605, warping the once-reviled fringe rebel into a widespread symbol of resistance.  The iconic version of the Guy Fawkes mask owes its popularity to the graphic novel and film *V for Vendetta*, which centers on a vigilante's efforts to destroy an authoritarian government in a dystopian future United Kingdom.  *See* http://theweek.com/articles/463151/brief-history-guy-fawkes-mask for the full article.

government could have further bolstered an objectively reasonable officer's determination that, by his insistence on wearing this mask, Plaintiff intended to threaten and intimidate the police. *See Wood*, 323 F.3d at 878 (emphasizing that whether arguable probable cause exists is determined by considering the "totality of the circumstances").

In short, and for all of the above reasons, we conclude that Defendants, at the very least, had arguable probable cause to arrest Plaintiff for violation of the mask statute. We disagree with the district court's conclusion to the contrary.

D.    Clearly Established Law

In deciding that clearly established law existed sufficient to put Defendants on notice that their arrest of Plaintiff was unconstitutional, the district court made the following statement: "The Eleventh Circuit has concluded that it is "*clearly established* than an arrest without probable cause to believe a crime had been committed violates the Fourth Amendment." (citation omitted) (emphasis in district court order). Of course, no one would disagree that the Fourth Amendment requires an arrest to be based on probable cause. But we reiterate that an officer who has arrested someone without probable cause might still be entitled to immunity. This is so because the "clearly-established" inquiry does not ask whether there was probable cause in actuality. Instead, it asks whether the pre-existing law was so clear that, given the specific facts facing a particular officer,

21

one must say that "every reasonable official would have understood that what he is doing violates" the Constitutional right at issue.  *al-Kidd*, 563 U.S. at 741.

In framing its inquiry more broadly than the above standard permits, the district court erred, running afoul of the Supreme Court's oft-repeated directive "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).  *See also White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality." (internal quotation marks omitted)); *City & Cnty. of San Francisco, Ca. v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (overruling the denial of qualified immunity and explaining that "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (overruling the denial of qualified immunity and commanding courts "not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."); *Reichle*, 566 U.S. at 665 (reversing the denial of qualified immunity and reiterating that "we have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of

22

the right are clear to a reasonable official." (quotations and citations omitted); *al-Kidd*, 563 U.S. at 742 (overruling the denial of qualified immunity); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (overruling the denial of qualified immunity: assertion of a general constitutional or statutory right is insufficient to defeat qualified immunity because "[i]f the test of 'clearly established law' were to be applied at this level of generality, . . . [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."). Rather, the clearly established law inquiry "must be particularized to the facts of the case." *White*, 137 S. Ct. at 552 (internal quotation marks omitted).

Reframing the analysis to conform with the direction of the Supreme Court, the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted. *See Mullenix*, 136 S. Ct. at 308 ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (internal quotation marks omitted)). Again, resolution of the clearly-established test does not depend on whether a judge might decide later that probable cause was lacking in fact. Instead, the test asks whether already existing law was so clear that, given the specific facts facing this particular officer, one

23

must conclude that "every reasonable official would have understood that what he is doing violates" the Constitutional right at issue. *al-Kidd*, 563 U.S. at 741. That judges disagree about a constitutional issue is itself evidence that a right is insufficiently clearly established for purposes of denying qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) (noting that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

Plaintiff does not cite, and we have not found, any already existing law that clearly established—beyond debate—the unlawfulness of an arrest under the circumstances present here.[5] And that is not surprising, given our conclusion that, at the very least, Defendants arguably had probable cause to arrest. Because we conclude—as a matter of law—that Defendants violated no already clearly established right, we thus conclude that the district court erred in denying

---

[5] What the Georgia Supreme Court decided in *Miller* is that Georgia's mask statute prohibits "mask-wearing conduct when the mask-wearer knows or reasonably should know that the conduct provokes a reasonable apprehension of intimidation, threats or violence": an intent that must be determined based on the surrounding circumstances of the case. *Miller*, 260 Ga. at 674. Then, in rejecting Miller's equal protection challenge, the Georgia Supreme Court observed that "In our view, the statute distinguishes appropriately between mask-wearing that is intimidating, threatening or violent and mask-wearing for benign purposes. It would be absurd to interpret the statute to prevent non-threatening political mask-wearing, or to condone threatening mask-wearing conduct on a holiday." *Id.* at 676. The "It would be absurd…" language is not the holding in the case, meaning it articulates no clearly established rule for purposes of federal qualified immunity. *See Crawford-El v. Britton*, 523 U.S. 574, 585 (1998) ("There is, of course, an important difference between the holding in a case and the reasoning that supports that holding."). But had the Miller court flatly construed the statute as proscribing only "threatening" conduct, no case authority existed in 2014 that would have obviously alerted Defendants that Plaintiff's conduct here could not be deemed as threatening, under all the circumstances.

24

Defendants' motion to dismiss based on qualified immunity.  Accordingly, we reverse the district court's denial of that motion.

### III.    Official Immunity

In addition to his federal claims, Plaintiff asserts state claims against Defendants alleging that they violated his privacy rights, committed an assault and battery against him, and unlawfully detained and maliciously prosecuted him. Defendants moved to dismiss Plaintiff's state claims on the ground of official immunity, which under Georgia law protects an officer from personal liability arising from his performance of "official functions" as long as the officer did not act with "actual malice" or "actual intent to cause injury."  *See* Ga. Const. art. I, § 2, para. IX(d).  The district court likewise denied this motion.

Similar to qualified immunity, official immunity is intended to "preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight."  *Cameron v. Lang*, 274 Ga. 122, 122–23 (2001).  It applies to an officer's "discretionary actions[6] taken within the scope of [his] official authority."  *Id.*

The parties agree that Defendants were performing a discretionary act within the scope of their official authority when they arrested Plaintiff.  Thus, Defendants can only be liable on Plaintiff's state claims if they acted with "actual malice" or

---

[6]  Officers can incur personal liability for the negligent performance of "ministerial functions." *See* Ga. Const. art. I, § 2, para. IX(d).

"actual intent to cause injury" as required to overcome official immunity. *See Adams v. Hazelwood*, 271 Ga. 414, 414–15 (1999) (applying Georgia's official immunity provision). The Georgia Supreme Court has defined actual malice in this context to mean a "deliberate intention to do wrong." *Id.* As such, actual malice is not established merely by showing that the defendant acted with "ill will." *Id.* Nor does actual malice encompass merely "the reckless disregard for the rights and safety of others." *West v. Davis*, 767 F.3d 1063, 1073 (11th Cir. 2014) (internal quotation marks omitted). Likewise, the phrase "actual intent to cause injury"—as used in Georgia's official immunity provision—means "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Id.* (internal quotation marks omitted).

None of the facts alleged in the complaint support a plausible claim that Defendants acted with actual malice or an actual intent to injure Plaintiff, as those terms have been defined by the Georgia Supreme Court. The only allegations that could potentially be relevant to a finding of actual malice or intent to injure are that: Defendants approached Plaintiff in "full riot gear" and arrested him without probable cause; they "pushed" or "pulled" Plaintiff while making the arrest; they handcuffed Plaintiff, transported him to the precinct and jail, and processed and booked him; and they made Plaintiff wait approximately twelve hours without

26

food, water, or a place to sleep. Construing these allegations as liberally as possible, together with our conclusion that arguable probable cause existed, the most that can be made of them is that Plaintiff was arrested and subjected to the routine inconveniences that attend any arrest. These facts are obviously insufficient to show actual malice or intent to injure. *See Reed v. DeKalb Cty.*, 264 Ga. App. 83, 86 (2003) ("Even when an arresting officer operates on a mistaken belief that an arrest is appropriate, official immunity still applies."); *Selvy v. Morrison*, 292 Ga. App. 702, 705 (2008) (holding that much more egregious conduct on the part of an arresting officer than is alleged by Plaintiff "may have shown poor judgment, rude behavior, and reckless disregard for the rights and safety of others" but not actual malice or intent to injure).

Accordingly, for the above reasons, we reverse the district court's denial of Defendants' motion to dismiss state-law claims made against them.

## CONCLUSION

We conclude that Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims and to official immunity on Plaintiff's state claims. We therefore **REVERSE** the district court's order denying dismissal of these claims under Federal Rule 12(b)(6) and **REMAND** the case with the direction that the district court dismiss these claims against the individual defendants.

KATHLEEN M. WILLIAMS, District Judge, dissenting in part:

Although I agree that official immunity warrants dismissal of the state-law claims against Appellants, I do not agree that the officers are entitled to qualified immunity on Gates's federal claims. More specifically, I believe that Gates has adequately pled that Appellants lacked actual or arguable probable cause to arrest him for wearing a Guy Fawkes mask during an admittedly peaceful protest in downtown Atlanta. Therefore, I would affirm the district court's finding that Gates's First and Fourth Amendment claims should survive a motion to dismiss.[1]

The majority concludes otherwise, based on a qualified immunity analysis that fails to adequately address the First-Amendment implications of the conduct and statute at issue here. While it is true that the existence of probable cause to arrest can defeat a First Amendment claim arising out of that arrest in certain circumstances—for example in cases like *Dahl* and *Redd*, where a presumptively valid arrest under an unrelated statute for non-protected conduct had the ancillary

---

[1] Because we are addressing this case on a motion to dismiss, the allegations in the amended complaint and its attachments, taken as true, must control our analysis of whether Gates has alleged a violation of a clearly established constitutional right that would preclude the application of qualified immunity. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) ("We review the denial of a motion to dismiss *de novo* and determine whether the complaint alleges a clearly established constitutional violation, accepting the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor, and limiting our review to the four corners of the complaint."); *Ledea v. Metro-Dade Cty. Police Dep't*, 681 F. App'x 728, 729 (11th Cir. 2017) (explaining that the qualified immunity analysis and the 12(b)(6) standard "become intertwined" at the motion to dismiss stage).

effect of terminating  protected speech—it is not appropriate here.  This is because the Anti-Mask Act, which was purportedly the sole basis of Gates's arrest, was itself challenged under the First Amendment over two decades ago in *State v. Miller*, 260 Ga. 669 (1990); it was saved only by implementing a narrowing construction of the statutory text that circumscribed the conduct subject to criminal penalty.[2]  Consequently, determining probable cause for arrest under the Anti-Mask Act—which underpins both the Fourth and First Amendment claims— necessarily requires an evaluation of whether Gates's actions fell within the category of protected expression that was deliberately identified as such by the *Miller* court.

The first question addressed in a qualified immunity analysis is whether the right was "clearly established" at the time of the alleged violation.  In order to demonstrate that a right is "clearly established" for the purposes of qualified immunity, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Under this standard, even assuming that the "clearly established right" must be defined more narrowly than an "arrest without

---

[2] As the majority acknowledges, the *Miller* court narrowed the reach of the statute to cover "only . . . mask-wearing . . . when the mask-wearer knows or reasonably should know that the conduct provokes a reasonable apprehension of intimidation, threats or violence," which "does not reach a substantial amount of constitutionally protected conduct" because "the restriction is limited to threats and intimidation, which is not protected expression under the First Amendment."  *State v. Miller*, 260 Ga. 669, 674 (1990).

probable cause . . . violates the Fourth Amendment," the specific right at issue here—whether individuals can be subject to arrest for wearing a mask during a peaceful protest—was "clearly established" at the time of Gates's arrest.

This Circuit has unambiguously held that "[our] [d]ecisions . . . have put police officers on notice for decades that protestors present on public property have a First Amendment right to peacefully express their views, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech." *Childs v. Dekalb Cty., Ga.*, 286 F. App'x 687, 693-94 (11th Cir. 2008). Based upon this body of caselaw, the *Childs* court determined that the officers in that case were not entitled to qualified immunity on the First Amendment claims arising out of an allegedly false arrest, because it was "one of those cases where 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question.'" *Id.* The same is true here.

But even beyond the clearly established right to peacefully protest that is set out in the First Amendment, it would be unreasonable for the officers to believe that the Anti-Mask Act was intended to cover the type of protected speech at issue here. As the *Miller* court declared in defending the constitutionality of the Anti-Mask Act twenty years ago, "[i]t would be absurd to interpret the statute to prevent non-threatening political mask-wearing." *Miller*, 260 Ga. at 676. Contrary to the

majority's suggestion, this pronouncement made clear that such conduct had never fallen within the purview of the Act; the court "eschew[ed] such a construction of the statute." *Miller*, 260 Ga. at 676 (1990). Thus, under any reading of what constitutes a clearly established right, there can be no doubt that "every reasonable official would have understood" that if Gates was engaging in "non-threatening political mask-wearing," there was no probable cause for arrest under the Anti-Mask Act and the officers cannot be shielded from suit by qualified immunity.

As to whether a violation of this right occurred, the majority suggests that there was no violation because "[they] think Defendants had actual probable cause to arrest Plaintiff for violating Georgia's mask statute." In support of this observation, they note that Gates's conduct fell within a purely textualist reading of the statute and did not qualify for any of the listed exceptions, making arrest under the statute reasonable. That conclusion is untenable. First, it ignores the majority's own acknowledgement that "the Georgia mask statute must be read in light of the limitations placed on it by the Georgia Supreme Court in *State v. Miller*, 260 Ga. 669 (1990) and *Daniels v. State*, 264 Ga. 460 (1994)." But, more importantly, it renders the binding decision by the *Miller* court a nullity, ignoring the limiting construction that saved the statute from constitutional infirmity and

31

permitting reliance on the already-rejected, plain-text reading to satisfy probable cause.[3]

Still, in order to prevail on his federal claims, Gates must also demonstrate that the officers lacked arguable probable cause for his arrest.  The complaint clearly acknowledges that the mask Gates wore concealed his identity.  As such, the question of arguable probable cause turns on whether, taking the facts alleged in the light most favorable to Gates, "reasonable officers in the same circumstances and possessing the same knowledge . . . *could* have believed" that Gates "intended to threaten, intimidate, or provoke the apprehension of violence" as opposed to simply being engaged in "non-threatening political mask-wearing."  *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (emphasis added); *Daniels*, 264 Ga. at 460-61; *Miller*, 260 Ga. at 676.

The majority offers two alternative bases for finding that the officers had arguable probable cause to believe that Gates intended to intimidate or should have known that his conduct would be intimidating.  First, they state that "[l]ike some other protesters, Plaintiff was wearing a mask that covered his entire face, and thus

---

[3] Plaintiff's complaint points out that the arrest report makes no mention of a "threat" or intent to threaten.  Instead, the report reinforces Plaintiff's contention that he was arrested based solely on the fact that he was wearing a mask and failed to remove it.  It states that Officer Khokhar "observed [Gates] wear a 'V for Vendetta' mask," that Gates "was actively participating in a protest" and that "the protesters had been warned on loud speakers multiple times that anyone wearing a mask will be arrested."  It then states, "Mr. Gates still had his mask on.  Mr. Gates was arrested for wearing a mask."

32

concealed his identity, during this night-time protest," concluding that "[t]hat conduct might be sufficient by itself to suggest an intent to intimidate."[4]  This reading of the breadth of the Anti-Mask Act cannot be reconciled with the analysis in *Miller*.  In fact, because the protest was concededly peaceful, this approach would prohibit the "non-threatening political mask-wearing" First-Amendment conduct that *Miller* explicitly allows, simply because the political event took place at night.  Absent more,[5] this cannot form the basis for arguable probable cause.

The majority goes on, however, to state that even if those circumstances alone were insufficient, Gates's failure to remove his mask when the police

---

[4] The Supreme Court has held arguably more "threatening" conduct to be "a far cry" from the "violence or threat of violence" that would bring such conduct outside of the protections of the First Amendment.  *See, e.g., Edwards v. South Carolina*, 372 U.S. 229, 233-35 (1963) (finding no threat of violence where a group of protesters assembled on State House grounds and refused to leave when told to do so by the police, instead engaging in "'boisterous,' 'loud,' and 'flamboyant' conduct, which, . . . later testimony made clear . . . consisted of listening to a 'religious harangue' by one of their leaders, and loudly singing 'The Star Spangled Banner' and other patriotic and religious songs, while stamping their feet and clapping their hands").

[5] The majority notes that the significance of the Guy Fawkes mask could "bolster" the Officers' reasonable inference that Gates intended to threaten or intimidate.  They rely on an article attached to the complaint, which explains that Guy Fawkes was an "infamous insurgent who tried to blow up the British Parliament in 1605," and that the mask bearing his face became popular based on "the graphic novel and film *V for Vendetta*, which centers on a vigilante's efforts to destroy an authoritarian government in a dystopian future United Kingdom."  Apart from the fact that this inference turns the motion to dismiss standard on its head, the citation does not posit an equivalent predicate to the violent legacy of the Ku Klux Klan in Georgia described in *Miller*: "harassment, intimidation and violence against racial and religious minorities carried out by mask-wearing Klansmen and other 'hate' organizations" that "operated as vigilantes and were responsible for numerous beatings and lynchings."  *Miller*, 260 Ga. at 672.  Nor does the admittedly peaceful protest in which Gates was engaged bear any resemblance to the Klan's vast legacy of domestic terror, which the *Miller* court discussed at length in their opinion and found to be clearly articulated by the Klan mask, whether worn by one or by many, in daytime or at night.

33

ordered the protesters to do so "changed [the calculus] dramatically," and led to a reasonable inference that such a refusal was "a gesture intended to intimidate." Again, the discussion of Gates's First Amendment right to anonymously protest in a non-violent manner is conspicuously absent from the conclusory finding that noncompliance with this order gave rise to arguable probable cause.

There can be no doubt that the order to remove the masks was directed at what would be constitutionally-protected expression,[6] unless it was brought outside the ambit of the First Amendment through some exception—here, the threat of violence or intimidation that was criminalized by the Anti-Mask Act.[7] As

---

[6] The Supreme Court has held that peaceful protests constitute "an exercise of . . . basic constitutional rights in their most pristine and classic form." *Edwards,* 372 U.S. at 233; *see also Brown*, 383 U.S. at 141-42 ("[w]e are here dealing with an aspect of a basic constitutional right—the right under the First and Fourteenth Amendments guaranteeing freedom of speech and of assembly, and freedom to petition the Government for a redress of grievances. . . . As this Court has repeatedly stated, these rights are not confined to verbal expression" and "certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence"); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1182 (11th Cir. 2009) ("Governments may not prevent protests, punish the exercise of the right to protest peacefully by arresting the demonstrators, nor unduly burden the right by forcing demonstrators to undergo excessive searches that violate the Fourth Amendment."). The right to anonymously engage in protected speech, especially political speech, has been similarly upheld by the Supreme Court. *See, e.g., Talley v. California*, 362 U.S. 60, 64 (1960) (upholding the right to anonymously engage in protected speech and noting that "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995) (observing that although "[t]he specific holding in Talley related to advocacy of an economic boycott, [] the Court's reasoning embraced a respected tradition of anonymity in the advocacy of political causes."). Indeed, the *Miller* court acknowledged this right in finding that engaging in non-threatening political mask-wearing was clearly protected conduct and not actionable under the Anti-Mask Act.

[7] Even apart from the Anti-Mask Act, nothing in the complaint or attached documents gives any indication that Gates's conduct involved the type of "lewd and obscene, [] profane, [] libelous,

34

discussed above, the record at this juncture does not demonstrate that such a threat existed at the time the order was given, and so there was no legal basis for ordering Gates to remove his mask.[8]    To the contrary, the order itself constituted an impermissible incursion on Gates's right to free speech, and, as the Supreme Court explained in *Wright v. State of Ga.*, 373 U.S. 284, 292 (1963), "[o]bviously, . . . one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."  *See also Brown v. State of La.*, 383 U.S. 131, 141 (1966).  To say that arguable probable cause arose when the police ordered Gates to remove his mask even if he was not violating the Anti-Mask Act prior to the order being given, would render Fourth and First Amendment protections meaningless: A Fourth Amendment claim cannot be defeated because a citizen continues to engage in protected political speech in contravention of an order she has no lawful obligation to obey.  And her non-criminalized, peaceful self-expression cannot be characterized as "threatening" and stripped of constitutional protection simply because a police officer orders her to stop.

---

and [] insulting or 'fighting' words" that would otherwise militate against invocation of the First Amendment. *Chaplinsky v. State of N.H.*, 315 U.S. 568, 572 (1942).

[8]  Plaintiff's complaint expressly alleges that the order to remove the masks was "unconstitutional" and "unlawful" because it was given "without regard to [the protesters'] constitutional right[] to wear [the] masks."

35

In sum, nothing in the complaint or attached documentation supports a finding that a reasonable officer could have believed that Gates's conduct evidenced an intent to threaten or intimidate, as required under the Anti-Mask Act. The complaint alleges that Gates was wearing a mask "to express himself" during a "peaceful protest" in downtown Atlanta, and that he was improperly arrested after the police gave an "unconstitutional . . . order" to remove his mask and he did not do so. The arrest report attached to the complaint similarly states that "Mr. Gates was arrested for wearing a mask" while participating in a protest, with no mention of threats or intimidation. Based on these allegations, it is clear that Gates's behavior is a far cry from the "terrorization by masked vigilantes" that the Anti-Mask Act was designed to prevent. *Miller*, 260 Ga. at 672. Instead, the record describes the type of "non-threatening political speech" that has unambiguously qualified as protected expression since the *Miller* decision in 1990. For that reason, I respectfully dissent.